Joshua Koltun (Bar No. 173040)
One Sansome Street
Suite 1400, No. 2544
San Francisco, California 94104
Telephone: 415.680.3410
Facsimile: 866.462.5959
joshua@koltunattorney.com

Attorney for Doe/LBRRN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOE/LBRRN, | Case No.: _____ |
| Movant, | **MOTION TO QUASH ADMINISTRATIVE SUBPOENA** |
| v. | |
| DEPARTMENT OF HOMELAND SECURITY of the UNITED STATES | *Filed herewith:*<br>Declaration of Doe/LBRRN<br>Declaration of Joshua Koltun<br>[Proposed] Order |
| Respondent. | Date: TBD<br>Time: TBD |

1
2
3

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................iv

MOTION.............................................................................................................................1

INTRODUCTION ...............................................................................................................1

BACKGROUND .................................................................................................................2

    A.    The government's immigration "sweeps" in Los Angeles have been extremely controversial and attracted national attention ...........................................................................2

    B.    LBRRN is part of a network of community activists that have been documenting and publicizing ICE/CBP conduct and organizing public opposition thereto ...........................5

    C.    LBRRN created a post that identified and "shamed" Officer Simeon..........................7

    D.    The government has taken the position that videotaping ICE/CBP agents and identifying them threatens their safety and has stated that it will prosecute those who do so .......................9

    E.    The government subpoenas Meta for the identity of LBRRN and her Instagram "collaborators," claiming that it is conducting a criminal investigation into them for threatening the safety of Officer Simeon.....................................................................................9

    F.    LBRRN has substantial and legitimate concerns about protecting her identity, that of her sources, and that of other community activists. ..........................................................10

ARGUMENT .....................................................................................................................11

I.    The motion is ripe for adjudication because the subpoena purports to be self-enforcing, and Meta is treating it as such, and disclosure would be an irreparable harm....................................11

II.    If the target of the subpoena can show that compliance would arguably infringe her First Amendment Rights, the burden shifts to the government to show that it has an interest that is sufficiently compelling to outweigh the First Amendment interest....................................12

III.    LBRRN has a strong First Amendment Interest in remaining anonymous .............13

IV.    DHS cannot show an interest in identifying LBRRN sufficiently compelling to outweigh

LBRRN's First Amendment Rights, for the conduct it purports to investigate is fully protected by the

First Amendment ..................................................................................................................15

A.    DHS does not have the statutory authority to undertake its purported criminal investigation or

to issue this Doe subpoena. ..............................................................................................16

B.    LBRRN's publication of truthful information, lawfully obtained, concerning Officer Simeon is

protected by the First Amendment ....................................................................................18

C.    LBRRN's characterization of ICE/CBP conduct as illegal – using terms such as kidnapping,

assault, and terrorism -- is protected by the First Amendment ........................................19

D.    LBRRN's posts did not threaten Officer Simeon's safety .........................................20

1.    LBRRN's posts did not constitute a "true threat" to Officer Simeon. ...................20

2.    LBRRN's post cannot be deemed to have incited others to harm Officer Simeon. .............21

CONCLUSION ....................................................................................................................22

Joshua Koltun ATTORNEY

Motion to Quash Admin Subpoena

### TABLE OF AUTHORITIES

**Cases**

*Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1213-14 (10th Cir. 2007) ................................ 19

*Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203-04 (9th Cir. 2018)) .................... 18

*Art of Living Found. v. Does,* 2011 U.S. Dist. LEXIS 129836 at *26-27 (N.D. Cal. 2011) ..... 12, 13, 15

*Askins v. United States Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018) ........................ 18

*Australia/Eastern U. S. A. Shipping Conference v. United States*, 1981 U.S. Dist. LEXIS 10121, at *50 (Dec. 23, 1981). ................................................................................................ 22

*Bartnicki v. Vopper*, 532 U.S. 514, 534-35 (2001) ................................................................ 19

*Boos* v. *Barry*, 485 U.S. 312, 322 (1988)). ........................................................................... 20

*Britt v. Superior Court*, 20 Cal. 3d 844, 852 (1978) ............................................................. 15

*Brock v. Local 375, Plumbers Int'l Union of Am.*, 860 F.2d 346, 349-50 (9th Cir. 1988) ................... 12

*Builders Ass'n of Greater Chicago. v. Cty. of Cook*, 1998 U.S. Dist. LEXIS 2991, at *14-16 (N.D. Ill. Mar. 10, 1998) ................................................................................................... 14

*Butterworth v. Smith*, 494 U.S. 624, 632 (1990) .................................................................. 13

*Coastal Abstract Serv. v. First Am. Title Ins. Co.*, 173 F.3d 725, 732 (9th Cir. 1999) ........................ 19

*Counterman v. Colorado*, 600 U.S. 66, 74, (2023) ................................................................ 20

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 494-9 (1975) ........................................................ 18

*Dole v. Serv. Employees Union, AFL-CIO, Local 280*, 950 F.2d 1456, 1459 (9th Cir. 1991); ............. 15

*Dow Chemical Co. v. Allen*, 672 F.2d 1262, 1276 (7th Cir. 1982 ............................................ 13

*Florida Star v. B. J. F.*, 491 U.S. 524, 538-89 (1989) ........................................................... 18

*In re Anonymous Online Speakers*, 2011 U.S. App. LEXIS 487 (9th Circuit), .......................... 13

*In re Ramirez*, 905 F.2d 97, 98 (5th Cir. 1990). ................................................................... 11

*League of B'nai Brith v. Superior Court,* 67 Cal.App. 4th 1072, 1092-94 (1998) ...................... 14

*Lee Tin Mew v. Jones*, 268 F.2d 376, 377 (9th Cir. 1959) ..................................................... 17

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995) ............................................. 12

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462, (1958) .......................................... 12

Motion to Quash Admin Subpoena

Joshua Koltun ATTORNEY

1  *Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1104 (N.D. Cal. 1999) ............................20

2  *NLRB v. Midland Daily News*, 151 F.3d 472, 475 (6th Cir. 1998)........................13

3  *Noem v. Perdomo*, No. 25A169, 2025 U.S. LEXIS 2779, at *22-23. ..........................3

4  *Nwanguma v. Trump*, 903 F.3d 604, 609 (6th Cir. 2018 ....................................22

5  *Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 208-09 (1946) ............................16

6  *Okla. Publ'g Co. v. Dist. Ct.*, 430 U.S. 308, 311-12 (1977)..............................18

7  *Perdomo v. Noem*, 2025 U.S. Dist. LEXIS 134409, at *25 (C.D. Cal. July 11, 2025) ..................3, 4, 5

8  *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010) ..........................12, 15

9  *Peters v. United States,* 853 F.2d 692 (9th Cir. 1988) ....................................17

10  *Rancho Publications v. Superior Court*, 68 Cal. App. 4th 1538, 1547 (1999)....................15

11  *Sheehan v. Gregoire*, 272 F. Supp. 2d 1135, 1150 (W.D. Wash. 2003)........................18

12  *Shoen v. Shoen* ("Shoen I"), 5 F.3d 1289, 1295 (9th Cir. 1993)(..........................14

13  *Shoen v. Shoen* ("Shoen II"), 48 F.3d 412, 416 (9th Cir. 1995) ............................14

14  *Smith v. Daily Mail Publishing Co.,* 443 U.S. 97, 105 (1979) ..........................18

15  *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) ..............................................20

16  *State ex rel. Cin. Enquirer v. Shanahan*, 2022-Ohio-448, ¶¶ 35-42 ....................19

17  *United States v. Cook*, 472 F. Supp. 3d 326, 327 (N.D. Miss. 2020) ......................16, 18, 21

18  *United States v. Minker*, 350 U.S. 179, 187 (1956) (..................................11, 17

19  *United States v. Trader's State Bank*, 695 F.2d 1132, 1133 (9th Cir. 1983) ................12

20  *Watts v. United States*, 394 U.S. 705, 706 (1969) ........................................20

**Statutes**

8 U.S.C. 1225..............................................................................11, 16

**Other Authorities**

Rest. of Torts (2d), § 566 (b) & (c)...........................................................19

Joshua Koltun ATTORNEY

21
22
23
24
25
26
27
28

Motion to Quash Admin Subpoena

*MOTION*

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTE that as soon as this matter may be heard in the United States District Court of the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, anonymous movant Doe/LBRRN ("LBRRN") will move, and does respectfully move this Court for an order quashing the administrative subpoena issued by the Department of Homeland Security ("DHS") to Meta Platforms, Inc. ("Meta") dated September 3, 2025.

The subpoena seeks the identity of the anonymous person – the Doe movant -- who created a page on Instagram (owned by Meta), and purports to be in support of a criminal investigation into that person. Because LBRRN has a First Amendment right to speak anonymously and associate with others anonymously for the purpose of exposing, documenting, criticizing and mobilizing community opposition to government policies and conduct, and because the purported criminal investigation solely involves conduct protected by the First Amendment, the Court should quash the subpoena.

This motion is made on Fed.R.Civ.P. 45, the First Amendment, 8 U.S.C. § 1225, the memorandum of points and authorities below, and the declarations of LBRRN and Joshua Koltun, and on all pleadings and materials on file with the Court, and all other such matters presented to the Court before the Motion is taken under submission.

*INTRODUCTION*

This case involves the sweeping immigration raids that the government has been conducting around the country. These raids are highly controversial and have generated intense public interest and heated debate. Ground zero for this controversy has been the sweeps conducted in Los Angeles, which the District Court deemed to violate the civil rights of those swept up in the immigration raids. The District Court's injunction was quickly stayed on an emergency basis by the Supreme Court, generating even more public interest.

Doe/LBRRN ("LBRRN") is an anonymous person who created an Instagram page in which she has been exposing, documenting, criticizing and mobilizing community opposition to government policies and conduct that she considers to be violations of human rights. The Department of

Homeland Security has declared that people who film immigration agents conducting these sweeps are committing "violence," and has promised to prosecute such people. The subpoena at issue here is seeking to strip LBRRN of her anonymity in the context of such a purported criminal investigation.

As explained below, LBRRN has a First Amendment right to anonymously publish images and videos of government agents, to identify them, to criticize what she considers to be their gross misconduct, and to mobilize community opposition to their conduct. The government has no legitimate interest in learning her identity. Indeed, the purported criminal investigation is entirely premised on activities that are fully protected by the First Amendment. The Court should quash the subpoena.

## BACKGROUND

### A.    The government's immigration "sweeps" in Los Angeles have been extremely controversial and attracted national attention

Agents of the Immigration and Customs Enforcement and/or the Border Patrol ("ICE/CBP") have been conducting sweeping raids around the country in which they seize and arrest persons that they allege are aliens without a legal right to be in the country. This has attracted intense public attention and controversy. In particular the "sweeps" in Los Angeles became intensely controversial, and were the subject of litigation that led the United States District Court to impose an injunction against certain ICE/CBP conduct. That injunction itself received intense public attention as it was appealed to the Supreme Court. Ultimately the Supreme Court granted an "interim," or "emergency" stay of the injunction. The reasons for the grant of the stay were not explained by the Court as a whole, but Justice Kavanaugh concurred in the grant. Justice Sotomayor, joined by Justices Kagan and Jackson, vigorously dissented, arguing that the sweeps were based on impermissible discriminatory bases:

> The Government, and now [Justice Kavanaugh's] concurrence has all but declared that all Latinos, U. S. citizens or not, who work low wage jobs are fair game to be seized at any time, taken away from work, and held until they provide proof of their legal status to the agents' satisfaction. As the District Court found, and the Government does not meaningfully contest, the present evidence reveals that the Operation At Large "seizures occurred based solely upon the four enumerated factors, either alone or in combination." … The Government now asks this Court to bless that conduct, at least temporarily, by issuing a stay.

*Joshua Koltun* ATTORNEY

- 2 -

*Noem v. Perdomo*, No. 25A169, 2025 U.S. LEXIS 2779, at *22-23.

> The Fourth Amendment protects every individual's constitutional right to be "free from arbitrary interference by law officers." [citation] After today, that may no longer be true for those who happen to look a certain way, speak a certain way, and appear to work a certain type of legitimate job that pays very little. Because this is unconscionably irreconcilable with our Nation's constitutional guarantees, I dissent.

*Id.* at *39.   Needless to say, both the merits of the claim that such "sweeps" violate the constitution, and the propriety of the Supreme Court's granting an emergency stay, effectively allowing  ("blessing") the sweeps, have been controversial and excited enormous public interest.

In his concurrence in the stay, Justice Kavanaugh described the factual situation in Los Angeles as follows:

> The Government sometimes makes brief investigative stops to check the immigration status of those who gather in locations where people are hired for day jobs; who work or appear to work in jobs such as construction, landscaping, agriculture, or car washes that often do not require paperwork and are therefore attractive to illegal immigrants; and who do not speak much if any English. If the officers learn that the individual they stopped is a U. S. citizen or otherwise lawfully in the United States, they promptly let the individual go. If the individual is illegally in the United States, the officers may arrest the individual and initiate the process for removal.

*Id.* at *2-3.   There is considerable public disagreement as to whether Justice Kavanaugh's bland description fully and fairly captures the facts on the ground in Los Angeles, or elsewhere.  The facts in the record were described by the District Court as follows:

As of January, ICE field offices are operating under orders to arrest at least seventy-five people a day, a quota that was later raised to 3,000 arrests per day.  *Perdomo v. Noem*, 2025 U.S. Dist. LEXIS 134409, at *25 (C.D. Cal. July 11, 2025).  Officers face employment consequences if these quotas are not met.  *Id.*

After the quota was raised, multiple raids occurred throughout the District at Home Depots, and "day laborers, …[c]ar wash workers, farm and agricultural workers, street vendors, recycling center workers, tow yard workers, and packing house workers" were targeted at various places, including "farmers markets, swap meet, bus stops, parks, gym, and church." *Id.,* at 20. The raids were sometimes "military" or "SWAT" style, in which agents arrived in "unmarked vehicles, pointed a gun, and demanded to see identification without providing a reason for the stop. *Id.* at 20-21. "Agents and

Joshua Koltun ATTORNEY

officers approach suddenly and in large numbers … heavily armed with weapons displayed, masked, and with their vest displaying a generic "POLICE" patch (if any display at all)." *Id.* They typically position themselves around individuals, aggressively engage them, and/or shout commands, making it nearly impossible for individuals to decline to answer their questions. *Id.* When individuals have tried to avoid an encounter with agents and officers, they have been followed and pushed to the ground, sometimes even beaten, and then taken away. *Id.* These incidents have been widely reported in the news. *Id.* The ICE/CBP agents "have a policy and practice of not identifying themselves or explaining the basis for an arrest upon taking someone into custody. *Id.* They "often show up masked, without any visible badges or insignia indicating what agency they work for, and have refused to identify themselves when asked." *Id.*

Some of the plaintiffs had described how these raids worked in practice. *Id.* at 25-30. For example, Vasquez Perdomo was waiting at a bus stop with co-workers waiting to be picked up for a job, when several cars converged and "about half a dozen masked agents jumped out on either side of him." *Id.* "They had weapons and masks, and did not identify themselves." *Id.* Vasquez Perdomo tried to leave but was surrounded, grabbed, handcuffed, and put into one of the vehicles. *Id.* No warrant was shown. *Id.* It was only after he was brought to a nearby CVS parking lot that agents checked Vasquez Perdomo's identification. *Id.* Agents did not inform Vasquez Perdomo that they were immigration officers authorized to make an arrest or of the basis for his arrest. *Id.* At the time this action was filed, Vasquez Perdomo had been transported to and was being held at B-18. There, he experienced extremely crowded and unsanitary conditions, was given little to eat or drink, and slept on the floor. *Id.* Others described similar experiences. *Id.* Presenting a California ID was insufficient; Detainees were told that they needed to present a passport. *Id.* Another U.S. citizen was detained because he was asked what hospital he was born in and did not know. *Id.*

These accounts are consistent with other accounts in the media of U.S. citizens being arrested and ICE/CBP agents refusing to look at identification. See, e.g., Koltun Decl., Exh. A.[1] Justice Kavanaugh did not explain on what basis the government agents would determine that an individual

---

[1] Media reports are cited in this brief not for the truth of the statements therein, but to show the existence of an intense public controversy.

Motion to Quash Admin Subpoena

was a U.S. citizen.  U.S. citizens don't ordinarily carry their passports on their person, if indeed they even have a passport.  The very considerable risk that these "sweeps" will sweep U.S. Citizens, as well as legal residents, along with those that that are not legally in this country, has elicited Congressional inquiries and concern.  Koltun Decl., Exh. B.[2]

Among the justifications the agents gave for detaining people was that they had tried to flee. As the Court commented, the government did not "explain why fleeing upon seeing unidentified masked men with guns exiting from tinted cars without license plates" should be considered suspicious.  *Id.* at *81 n.30.

Indeed, the fact that ICE/CBP agents are masking themselves and refusing to identify themselves while accosting and arresting people, has itself been highly controversial.  *See, e.g.* Koltun Decl., Exh. C. Indeed the California legislature was so disturbed by this practice that it passed legislation to forbid it.  *Id.,* Exh. D.  LBRRN is part of a network of community activists that have been documenting and publicizing ICE/CBP conduct and organizing public opposition thereto

Movant Doe/LBRRN ("LBRRN") is a human rights activist who documents immigration enforcement activity to protect civil liberties and public safety. LBRRN Decl., ¶ 1.  She[3] is deeply motivated by a personal need and desire to serve and protect her community, especially vulnerable populations who are often targeted or silenced.  *Id.*  She shares the expectation of most Americans that law enforcement officers will identify themselves and act transparently. *Id.*  By documenting enforcement activity, she seeks to create a factual record, protect vulnerable community members, and ensure accountability when constitutional or statutory rights may be violated.  *Id.*  Moreover, whether or not the conduct she documents is illegal, she believes that it is wrong and wishes to advocate and mobilize public opposition to ICE/CBP policies and conduct.  *Id.*   Because of her strongly held beliefs that these ICE/CBP raids are illegal[4] and immoral, she often characterizes them as

_____

[2]Again, this congressional inquiry is cited, not for the truth, but to show the existence of an important public issue.

[3]This brief will refer to LBRRN as "she" for simplicity and clarity; this is not a disclosure of LBRRN's actual gender.

[4]For reasons explained in section IV.C, it is irrelevant whether LBRRN's characterization of these raids as illegal is correct as a matter of law.  But it should be noted that she made these

kidnappings, assaults, terrorizing, traumatizing and so forth.  *Id.*

She is part of network of similar-minded activists who similarly document ICE/CBP conduct and mobilize public opposition.  *Id.,* ¶ 2.  She has created a page on Instagram -- LBRRN (@longbeachrapidresponse) • Instagram photos and videos[5] – on which she posts documentation, videos, criticism, and calls to public action concerning the ICE/CBP raids and sweeps in Long Beach. *Id.,* Exh. A.  The various posts on her Instagram page contain images and montages, including videos of public raids, and documenting the circumstances surrounding each detention. *Id.* The information she gathers and posts is intended to provide a factual record that can be used by attorneys and community members to seek justice and hold government actors accountable.  *Id.*  These were not necessarily created by LBRRN, but may have been shared from other Instagram accounts.  *Id.*  An Instagram post may list the poster and other "collaborators" who have shared that post on their own Instagram account.  *Id.*  Instagram also enables other Instagram users viewing a post to leave comments.  *Id.*

Her posts include documentation of what she considers to be ICE/CBP misconduct.  *Id,* ¶ 3. For example, one of LBRRN's posts concerns a raid in Long Beach at the Bixby Knolls car wash. *Id., Exh. B*  (the post links to a video at  https://www.instagram.com/stopicenet/p/DOkSHXGEVna/).  The posted video shows the car wash business manager telling the masked government agent that the person he is arresting "is a resident, he has papers."  The video shows the arrestee holding documents in his hand (with his hat) behind his back, because he has been handcuffed.  *Id.*  The agent takes the documentation, declines to look at it, and hustles the arrestee into his vehicle.  *Id.*  The agent says, "we're going to check, and if he's good, we'll bring him back."  *Id.*  According to his lawyers, the arrested individual, Jose Jesus Rodriguez Torres, had applied for a U-Visa (i.e. for victims of crime). Koltun Decl., ¶ 6. Because there is a limited number of U-visas available at the moment, but Rodriguez-Torres had made a prima facie case of eligibility, the government gave him a work visa

---

statements in the context of the District Court proceeding as it stood at the time, in which the operations were in fact deemed by the Court to be illegal.  The merits of that contention have yet to be fully adjudicated, notwithstanding the interim stay issued by the Supreme Court.

[5]The N in LBRRN stands for network.  There is in fact a group of community activists that associate under that name (including Doe/LBRRN), but for purposes of this brief we will use the term LBRRN to refer to the anonymous person that controls the Instagram account called LBRRN.  *Id.*

Joshua Koltun ATTORNEY

1   while his application was pending. *Id.* Exh. E ("Your [Employment Authorization] card is proof that

2   you are allowed to work in the United States"). His work permit card was taken by the agent, and was

3   not returned to him.. *Id.* Fortunately, Rodrigues Torres had taken a picture of the documents. *Id.,*

4   Exh. F ("Employment Authorization" card, Social Security card). Taking such pictures of legal

5   documents is something that the community activists have been training people to do, because of the

6   risk that ICE/CBP will confiscate such documents. LBRRN Decl., ¶ 3. Since in fact he had used an

7   attorney to obtain legal status, his attorney also retained copies of the relevant documents. Koltun

8   Decl., ¶ 6. Mr. Rodriguez Torres remains in custody as his immigration lawyers struggle to learn why

9   he was detained and to persuade the authorities to release him and let him go back to work. *Id.*

10      **B.    LBRRN created a post that identified and "shamed" Officer Simeon**

11          One of the things that LBRRN and other community activists have been doing is to identify

12   the government agents who have been conducting these raids while wearing masks and otherwise

13   concealing their identities and refusing to explain what they are doing. LBRRN Decl., ¶ 4. One of

14   the government agents LBRRN and other of her collaborators and sources have identified is Officer

15   Simeon, the subject of the subpoena at issue. *Id.* Although Officer Simeon has usually conducted

16   raids wearing a mask and a uniform that does not have a nametag, he could be identified because he

17   persisted in his habit of wearing a wearing a distinctive green scarf around his neck or over his face.

18   *Id.* Based on publicly available documents, one can compare images of him conducting raids while

19   masked (wearing the scarf), with other pictures or images in which he showed his face and/or wore a

20   uniform with a nametag. *Id.* Indeed, on one occasion his name during a raid, making that information

21   available to anyone observing his official actions in public. *Id.* One can also trace Officer Simeon's

22   prior history as a law enforcement agent. *Id.* This information was obtained from lawful and publicly

23   available sources, including videos and materials published by the Customs and Border Protection

24   website, as well as videos produced by other journalists documenting raids and ICE activity. *Id.*

25          LBRRN posted a montage that identified Officer Simeon, showing images and videos with his

26   face and or nametag exposed, often wearing the identifying green scarf. *Id.,* ¶ 5, Exh. D

27   (https://www.instagram.com/p/DOIBbNukZyN/). The montage does not involve any private

28

communications, personal devices, or confidential records, nor were any such used to identify him. *Id.* Indeed much of the montage consists of images or videos of Simeon publicly participating in raids. *Id.*

The montage ends with a image in the format of a poster, which reads as follows:

WARNING

SUSPECTED KIDNAPPER/TERRORIST

[Still images of Simeon, from montage]

Los Angeles, CA    #GeorgySimeon

Georgy Simeon, Border Patrol Agent, El Centro Sector (ELC)
Hometown: Brawley, CA
From: Coving GA/Atlanta GA
Formerly with Atlanta PD's A.P.E.X. Unit

[Images of Simeon, with the following captions]

Joined CBP 2021   Playa Vista 6/29   Downey, 8/27

Disclaimer: This is a community warning only. All info is from public sources and may be incomplete or inaccurate. We make no legal claims as to guilt. We condemn all threats, violence, harassment, or sharing private info including addresses phone numbers or family member info. The First Amendment protextfor text documentation of suspected official misconduct. [6]

DO NOT APPROACH OR ATTEMPT TO APPREHEND THIS INDIVIDUAL.

*Id.,* Exh. C.[7] Next to this "poster," LBRRN posted a comment that began "Let's welcome Georgie Simeon to the wall of shame." *Id.,* Exh. D. [8] LBRRN did not encourage any violence against Simeon nor has she ever encouraged violence against any government agent, or indeed against anyone. *Id.*

---

[6]If one were viewing this post on one's cellphone, one could expand the size to make the disclaimer easier to read. *Id.*

[7]The "poster" is initially shown in the montage in English, and then, as the montage proceeds, it is translated into the languages of various immigrant communities in Long Beach: Spanish, Chinese, Vietnamese, Cambodian and Tagalog.

[8] The comment mocks Simeon's "poor OpSec" – Operational Security – in that he had tried to conceal his identity but failed. *Id.* The comment refers to Terminal Island, a detention facility where the agents are gathering before raids, and the fact that the agents are all staying in a hotel in Long Beach. *Id.* Community activists have been staging continual protests at that hotel. *Id.*

Joshua Koltun ATTORNEY

**C.    The government has taken the position that videotaping ICE/CBP agents and identifying them threatens their safety and has stated that it will prosecute those who do so**

Department of Homeland Security Kristi Noem has used the term "violence" to include "anything that threatens [DHS agents] and their safety. It is doxing them. It is videotaping them where they're at."  Koltun Declaration, ¶ 7 Exh. G.  DHS Assistant Secretary for Public Affairs Tricia McLaughlin told the Center for Media and Democracy (CMD) that "videotaping ICE law enforcement and posting photos and videos of them online is doxing our agents," and added: "We will prosecute those who illegally harass ICE agents to the fullest extent of the law." *Id.*

**D.    The government subpoenas Meta for the identity of LBRRN and her Instagram "collaborators," claiming that it is conducting a criminal investigation into them for threatening the safety of Officer Simeon.**

On or about September 3, the Department of Homeland Security sent Meta Platforms, Inc. ("Meta"), the parent company of Instagram, an administrative "Immigration Enforcement Subpoena" requiring the production of records "in connection with an investigation or inquiry relating to the enforcement of U.S. Immigration laws."  Koltun Decl., ¶ 8 & Exh. H.   The document is captioned "Officer Safety/Doxing: Simeon." *Id.*  It states that "pursuant to an official, criminal investigation regarding officer safety, please provide the subscriber names, emails and telephone numbers associated as of 8/01/2025 through 9/03/2025 to the following Instagram Account usernames," listing LBRRN and the other five "collaborators" who were listed on the posting concerning Officer Simeon. *Id.*  Meta then emailed Instagram account holders a copy of the subpoena, together with a notice from its "Law Enforcement Response Team" that Meta has "received legal process from law enforcement seeking information about your Instagram account," and "that if we do not receive a copy of documentation that you have filed in court challenging this legal process within ten 10 days, we will respond to the requesting agency with information about the requested Instagram account." *Id.*  A later  message stated "Please provide us with a file stamped copy of your motion to quash by

Motion to Quash Admin Subpoena

9/19/2025." *Id.*[9]

In response to a motion to quash filed by another target of this subpoena, the Court has ordered as follows: "Pending resolution of this matter, the Court ORDERS Meta not to produce the requested information without further order of the Court." Case 3:25-mc-80286-TSH, D.E. 4.

### E.    LBRRN has substantial and legitimate concerns about protecting her identity, that of her sources, and that of other community activists.

LBRRN and other community activists, including her Instagram "collaborators," post their information, criticisms, and calls to public action anonymously. *Id.,* ¶ 6. This anonymity is essential to enable them to work and associate without fear of retaliation or interference by the government or by others who oppose their views on ICE/CBP conduct. *Id.* Given the aggressive conduct and positions the government has taken towards all dissent, and in particular those who are documenting government conduct, LBRRN and the other the community activists are quite reasonably concerned about the repercussions if the government (or supporters of the government) were to learn their identities. *Id.* Among other things, they reasonably fear that if their identities were disclosed, the government will make good on its threat to prosecute them, prosecutions which, for the reasons discussed in this brief, would be frivolous, but would nevertheless be extremely burdensome. *Id.* Moreover, LBRRN has greatly benefited from the assistance of confidential sources who have provided her with information and documentation that was essential to her own reporting and documentation if ICE/CBP conduct. *Id.* LBRRN believes that such confidential sources of information would promptly dry up if the government were to succeed in stripping LBRRN of her anonymity. *Id.* Potential confidential sources would quite reasonably infer that they themselves were at risk of having the government strip them of their own anonymity. *Id.*

---

[9]LBRRN did not receive a copy of this notice. The undersigned has been in contact with Meta counsel who has confirmed that the reason for this was a technical difficulty in transmitting any notice to LBRRN. *Id.* The process of opening a line of communications with Meta and determining the status has been disturbingly complex and slow. *Id.* But as of this moment, the undersigned has confirmed that Meta has not released any information about LBRRN, and has at least until midnight September 19 to get a motion to quash on file. *Id.* Meta's counsel sent a copy of the subpoena to LBRRN, which redacted the other "collaborators," and also redacted Officer Simeon's name. But Meta did not redact Officer Simeon's name in other redacted copies of the subpoena sent to the other "collaborators" on the Simeon post, so one is able to determine what the subpoena to LBRRN is about. *Compare id.,* Exh. H with Exh.I.

Joshua Koltun  ATTORNEY

***ARGUMENT***

**I.      *The motion is ripe for adjudication because the subpoena purports to be self-enforcing, and Meta is treating it as such, and disclosure would be an irreparable harm***

This case involves an administrative subpoena under 8 USC § 1225(d).  Koltun Decl., Exhs. H, I.  That statute provides that such a subpoena is NOT self-enforcing.  Meta would only have a legal obligation to respond to the subpoena in the event that (i) it chose NOT to respond to the subpoena, (ii) DHS went into district court and asked for an order requiring such a response and (iii) the District Court issued such an order.  8 USC 1225(d)(4)(B).  Then and only then would Meta face a legal obligation to comply.  *Id.*  And Meta would only face contempt for failing to obey the court order.  *Id.*  Indeed, where the recipient of such a subpoena moves to quash, the matter should not be ripe for adjudication because DHS had not taken any steps to enforce the subpoena. *See In re Ramirez*, 905 F.2d 97, 98 (5th Cir. 1990).

But the subpoena ***here*** purports on its face to be self-enforcing.  It states "failure to comply with this subpoena may subject you to an order of contempt by a federal District Court, as provided in 8 USC 1225(d)(4)(B)."  That is very misleading.  The court must first determine whether one has an obligation to comply, and ***order such compliance***, and only disobedience of ***such an order*** would subject one to contempt.  Nevertheless, in the face of this subpoena Meta has taken the position that it is legally obligated to disclose the information requested in the subpoena unless the targets of the subpoena move this Court to quash it.  Koltun Decl., ¶ 8.

> The subpoena power is a power capable of oppressive use, especially when it may be indiscriminately delegated and the subpoena is not returnable before a judicial officer. . . . True, there can be no penalty incurred for contempt before there is a judicial order of enforcement. But the subpoena is in form an official command, and even though improvidently issued it has some coercive tendency, either because of ignorance of their rights on the part of those whom it purports to command or their natural respect for what appears to be an official command, orbecause of their reluctance to test the subpoena's validity by litigation.

*United States v. Minker*, 350 U.S. 179, 187 (1956) (citation omitted) (quashing immigration administrative subpoena).

Here disclosure of the identity LBRRN, who is an anonymous speaker "is itself an irreparable

harm." *Art of Living Found. v. Does,* 2011 U.S. Dist. LEXIS 129836 at *26-27 (N.D. Cal. 2011). Under these circumstances LBRRN and the other movants are entitled to move for, and obtain, an order to quash from this Court.

## II.    If the target of the subpoena can show that compliance would arguably infringe her First Amendment Rights, the burden shifts to the government to show that it has an interest that is sufficiently compelling to outweigh the First Amendment interest

The First Amendment protects the right to speak anonymously and the right to associate anonymously with others.   See, e.g., *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995) (speech); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462, (1958) (association).

A two-part test applies when government investigations arguably impinge on First Amendment rights of those from whom compelled disclosure is sought. *See, e.g., Brock v. Local 375, Plumbers Int'l Union of Am.*, 860 F.2d 346, 349-50 (9th Cir. 1988); *United States v. Trader's State Bank*, 695 F.2d 1132, 1133 (9th Cir. 1983).   The court should apply heightened scrutiny to any attempt to compel disclosure of the identity of anonymous speakers or members of an association, if they make a "*prima facie* showing of arguable first amendment infringement . . . that enforcement . . . will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010) (citing and quoting *Brock* and. *Trader's State Bank*). Put another way, a threshold showing must be made that disclosure of identifying information "will have a deterrent effect on the exercise of protected activities." *Perry* at 1162.

Once the initial threshold showing of an arguable First Amendment infringement is made, "the evidentiary burden shifts to the plaintiffs to demonstrate a sufficient need for the discovery to counterbalance that infringement. *Perry,* 591 F.3d at 1164.  This heightened First Amendment standard cannot be met merely by showing that the information "might reasonably lead to the discovery or admissible evidence." *Id.* at 1164.  The government's "interest in obtaining the disclosures" must be "sufficient to justify the deterrent effect . . . on the free exercise . . . of [the] constitutionally protected right." *Id.* (quoting *NAACP*, 357 U.S. at 463); *accord Dow Chemical Co. v.*

- 12 -

Joshua Koltun ATTORNEY

1    *Allen*, 672 F.2d 1262, 1276 (7th Cir. 1982)(quashing administrative subpoena to researchers from

2    chemical company in EPA hearing where enforcement of subpoena would be "unnerving and

3    discouraging" and would "inevitably tend[] to check the ardor and fearlessness of [the] scholars.")

4
5    **III.    LBRRN has a strong First Amendment Interest in remaining anonymous**

6        In determining the weight of an anonymous speaker's First Amendment interest, the district

7    court should focus on the "nature" of the speech conducted by the defendant, rather than the cause of

8    action alleged by the plaintiff." *Art of Living,* 2011 U.S. Dist. LEXIS 129836, at *13-14; *In re*

9    *Anonymous Online Speakers*, 2011 U.S. App. LEXIS 487 (9th Circuit), ("We suggest that the nature of

10    the speech should be a driving force in choosing a standard by which to balance the rights of

11    anonymous speakers in discovery disputes.") "For example, a more rigorous standard may be

12    applicable where the defendant's speech is political, religious or literary, while commercial speech

13    should be subject to a lesser standard." [10]   *Art of Living,* at *13-14.  The First Amendment interest is

14    particularly important where the anonymous speech implicates a "public issue," including "heated

15    discussion and criticism" of matters that "impact the lives of many individuals," especially

16    "governmental activities." *Id.* at *16-17.

17        As discussed above, the ICE/CBP sweeps and raids have attracted national attention, and in

18    particular the situation in Los Angeles, interest that has only increased after the Supreme Court's

19    granting of the emergency stay, and the dueling opinions of Justices Kavanagh and Sotomayor.  The

20    sweeps have involved thousands of individuals being detained every day.  LBRRN has been

21    documenting these sweeps in Los Angeles and contributing her own vehement criticisms of what has

22    been happening on the ground.  The " publication of information relating to alleged governmental

23    misconduct … has traditionally been recognized as lying at the core of the First Amendment.

24    *Butterworth v. Smith*, 494 U.S. 624, 632 (1990).

25
26    [10]Nevertheless even a less weighty First Amendment interest, such as commercial speech, may
      be sufficient to quash a subpoena.   *See NLRB v. Midland Daily News*, 151 F.3d 472, 475 (6th Cir.
27    1998) (quashing administrative subpoena regarding anonymous employment advertisements, which
      would "chill the lawful commercial speech of periodicals and employers nationwide.")

28

Joshua Koltun ATTORNEY

The First Amendment interests of persons reporting on matters – particularly on issues of public concern, and especially those reporting on official conduct, depends on being able to cultivate the trust of sources and others with whom one is collaborating.  This is the justification for the First Amendment's Reporter's Privilege, as the Ninth Circuit has explained:

> The compelled disclosure of damaging confidential sources' trust in the press' capacity to keep secrets and, in a broader sense, by converting the press in the public's mind into an investigative arm of prosecutors and the courts. It is their independent status that often enables reporters to gain access, without a pledge of confidentiality, to meetings or places where a policeman or a politician would not be welcome. If perceived as an adjunct of the police or of the courts, journalists might well be shunned by persons who might otherwise give them information without a promise of confidentiality, barred from meetings which they would otherwise be free to attend and to describe, or even physically harassed if, for example, observed taking notes or photographs at a public rally.

*Shoen v. Shoen* (*"Shoen I"*), 5 F.3d 1289, 1295 (9th Cir. 1993)(internal quotation and citation omitted).  Therefore "compelled disclosure is the exception, not the rule," because if the privilege does not prevail in all but the most [**12]  exceptional cases, its value will be substantially diminished." *Shoen v. Shoen* ("Shoen II"), 48 F.3d 412, 416 (9th Cir. 1995)(citation omitted).

LBRRN is covered by the Reporter's Privilege, because, in documenting ICE/CBP conduct, she was engaged in "gathering news for dissemination to the public." *Shoen I*, 5 F.3d at 1294.  That she is also an advocate and activist is entirely consistent with her right to invoke the First Amendment Reporter's Privilege.  Persons other than those in the mainstream news media have played a "vital role in bringing to light 'newsworthy' facts on topical and controversial matters of great public importance … expos[ing] widespread corruption and abuse in American life.  *Shoen I,* 5 F.3d at 1293.  "What makes journalism journalism is not its format but its content."  *Id.*

The Reporter's Privilege has thus been held to protect not only traditional media organizatoins but also advocacy organizations.  *Builders Ass'n of Greater Chicago. v. Cty. of Cook*, 1998 U.S. Dist. LEXIS 2991, at *14-16 (N.D. Ill. Mar. 10, 1998) ("advocacy organization" Urban League was entitled to invoke the privilege to protect surveys and interviews where the information garnered was to be disseminated to the public.); *Anti-Defamation League of B'nai Brith v. Superior Court,* 67 Cal.App. 4th 1072, 1092-94 (1998) (public advocacy organization successfully invokes Reporter's Privilege).

Whether or not the formal Reporter's Privilege applies, and equivalent First Amendment

Joshua Koltun ATTORNEY

interest applies to people and organizations that have been associating for the purpose of influencing public discourse and public affairs, and thus their activities have been protected from discovery as well. *See, e.g., Britt v. Superior Court,* 20 Cal. 3d 844, 852 (1978) (quashing discovery by airport into those organizing against it); *cf Rancho Publications v. Superior Court*, 68 Cal. App. 4th 1538, 1547 (1999) (First Amendment privileges apply both to a newspaper's right to protect sources' anonymity and the sources' rights to anonymously organize public opposition to the subpoenaing party, a hospital).

Thus the First Amendment interests of LBRRN and her activist associates (including the other targets of the subpoena) are weighty. LBRRN has an interest in protecting her own right, and those of her associated activists, to speak and organize and associate anonymously, through Instagram accounts and otherwise, and she has an interest as well in protecting the anonymity of those who have confidentially passed information to her that is essential to her own reporting and documenting what she considers to be government misconduct. If any of them are stripped of their anonymity be compliance with the subpoenas, their important investigative work will be hampered and discouraged. LBRRN Decl., ¶ 6. Their concerns are particularly reasonable in light of the highly aggressive threats to prosecute their activities as criminal. Such prosecutions would be frivolous, but nevertheless extremely burdensome; presumably that is the point of the threat. *See* Koltun Decl., Exh. G. These quite reasonable concerns are precisely the chilling effect that the First Amendment protects against.[11]

### IV.    DHS cannot show an interest in identifying LBRRN sufficiently compelling to outweigh LBRRN's First Amendment Rights, for the conduct it purports to investigate is fully protected by the First Amendment

Here, the sum total of what the subpoena discloses is that it relates to "Officer Safety/Doxing: Simeon," stating that it is "[p]ursuant to an official, criminal investigation regarding officer safety."

---

[11] In *Perry*, that threshold determination was satisfied by declarations that, although "lacking in particularity," were "consistent with the self-evident conclusion that important First Amendment interests were implicated," because they "create[d] a reasonable inference that disclosure would have the practical effects of discouraging political association and inhibiting internal … communications that are essential to effective association and expression." 591 F.3d at 1163-64; *accord Dole v. Serv. Employees Union, AFL-CIO, Local 280*, 950 F.2d 1456, 1459 (9th Cir. 1991); *Art of Living*, 2011 U.S. Dist. LEXIS 129836, at *28.

Motion to Quash Admin Subpoena

Joshua Koltun ATTORNEY

Koltun Decl., Exhs. H, I.

"Doxing" means to publicly disclose "a person's information, such as address or family members' names. *United States v. Cook*, 472 F. Supp. 3d 326, 327 (N.D. Miss. 2020).  But LBRRN has not doxed Officer Simeon.  She did not disclose his address or say anything about his family.[12]  Nor has she ever threatened his or their safety.

The subpoena is evidently an instance of DHS's untenable expansion of the word "violence" to include speech, and "doxing" as the "videotaping ICE law enforcement and posting photos and videos of them online," and its threat to prosecute those who do that "to the fullest extent of the law." Koltun Declaration, Exh. G.  The difficulty for DHS is that the "full extent of the law" does not extend to LBRRN's conduct, which is fully protected by the First Amendment.

**A.    *DHS does not have the statutory authority to undertake its purported criminal investigation or to issue this Doe subpoena.***

The subpoena states that it is issued under 8 U.S.C. 1225(d), and relates to "officer safety/doxing," to wit, a "criminal investigation related to officer safety."  But the federal statutes do not authorize ICE to conduct such a criminal investigation.

The court must determine whether an administrative subpoena relates to an "investigation … authorized by Congress, is for a purpose Congress can order, and the documents sought are relevant to the inquiry." *Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 208-09 (1946).  The statute here authorizes administrative subpoenas "relating to the privilege of any person to enter, reenter, reside in, or pass through the United States *or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the [Immigration and Naturalization] Service*." 8 U.S.C. 1225(d)(4) (emphasis added).  The highlighted phrase should be interpreted narrowly. Interpreting a different section of the immigration code that also contained that phrase, Supreme Court ruled that "Congress has not provided with sufficient clarity that the subpoena power granted by § 235 (a) extends over persons who are the subject of denaturalization investigations; therefore Congress is

---

[12]By the same token, LBRRN's posting cannot be a violation of 18 U.S.C. 119, because she has not posted any "restricted personal information" as defined in section (b)(1) of that statute.  Moreover, the terms "threaten, intimidate, or incite" in section (a)(1) must be interpreted consistent with the First Amendment restrictions on those concepts as discussed in section IV.D. below.

Joshua Koltun ATTORNEY

not to be deemed to have done so impliedly." *Minker*, 350 U.S. at 190.  The Court justified its "restrictive reading" by noting that the " subpoena power is a power capable of oppressive use." *Id.* at 187 (citation omitted).

That phrase in section 1225 was narrowly interpreted in *Lee Tin Mew v. Jones*, 268 F.2d 376, 377 (9th Cir. 1959) (quashing administrative subpoena).  In that case the government had not shown any basis to believe – or that it did believe -- that the person subpoenaed was not a citizen (as he claimed).  *Id.,*at 379-80.  The court ruled that the "concerning any matter …" phrase did not convey a "blanket affirmation of the right of the immigration officer" to inquire into any matter "without affirmative proof of the jurisdictional foundation" for the subpoena's demand.  *Id.*

Moreover, the relevant statutes do not authorize the issuance of Doe subpoenas.  In *Peters v. United States*, the INS (precursor to ICE) argued by analogy to Internal Revenue Service authority that the INS had the authority to issue Doe subpoenas.  *Id.* 853 F.2d 692, 697-98 (9th Cir. 1988).[13] The Court disagreed, noting that the IRS had specific statutory authority to issue Doe subpoenas, which authority was accompanied by special procedures designed to protect the rights of the Doe defendants.  *Id.*  By contrast, the INS had no such explicit statutory authority, and no mechanism had been provided to assure the protection of the rights of the unnamed Does being investigated.  *Id.* The subpoena was quashed.  *Id.* at 700.

Significantly, the subpoena that was quashed in *Peters* was aimed at determining whether the Does were undocumented aliens.  *Id.* at 693.  Here, by contrast, there is no suggestion that the Doe targets of this investigation are undocumented aliens, or indeed that they have violated the immigration laws.

Thus the investigation and the subpoena in support of it has not been authorized by Congress. And, in any event, as discussed below, the purported basis for the investigation arises entirely from conduct protected by the First Amendment.

---

[13]The court explained that the IRS statute specifically permitted the issuance of "John Doe summons," which were, "for all intents and purposes, actually [] subpoena[s].  *Id.* at 695.n3.  The court used the term "Doe subpoenas" to refer to subpoenas that, like the one in the instant case, seek "information concerns individuals whose identity is currently unknown to the INS." *Id.*

Joshua Koltun ATTORNEY

**B.**      ***LBRRN's publication of truthful information, lawfully obtained, concerning Officer Simeon is protected by the First Amendment***

The First Amendment protects the publication of truthful information lawfully obtained. *Smith v. Daily Mail Publishing Co.,* 443 U.S. 97, 105 (1979) (statute that barred media from publishing the names of juveniles named in indictments without court's permission violated the First Amendment). This is true even for highly personal information that is already in the public domain. *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 494-9 (1975) (identity of rape victim).  Thus a statute that prohibits the publication or distribution of lawfully-obtained, publicly-available personal identifying information regarding law enforcement officers is unconstitutional.  *Sheehan v. Gregoire*, 272 F. Supp. 2d 1135, 1150 (W.D. Wash. 2003)

 LBRRN's publication of Officer Simeon's identity only disclosed true facts about him that she was able to determine from other public sources.  The First Amendment specifically protects the rights of those who photograph and record the government agents conducting these raids.  "The First Amendment protects the right to photograph and record matters of public interest," including the right to record law enforcement officers engaged in the exercise of their official duties in public places." *Askins v. United States Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018) (citing *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203-04 (9th Cir. 2018)).

The First Amendment's protection of the right to publish information obtained from public records includes information that was accidentally or inadvertently disclosed. *Florida Star v. B. J. F.*, 491 U.S. 524, 538-89 (1989) (newspaper could not be barred from publishing name of rape victim that had been wrongly released by police); *Okla. Publ'g Co. v. Dist. Ct.*, 430 U.S. 308, 311-12 (1977) (striking down injunction barring publication of name and photograph of juvenile who appeared at pretrial proceeding that was supposed to be closed, but was not).

Thus "doxing" a person by sharing "public information, while potentially offensive and disagreeable" and therefore is protected by the First Amendment.  *Cook,* 472 F. Supp.3d at 327.

Moreover, where the media is reporting on matters of public concern, the First Amendment protects publication of such information even if the information had been independently leaked to it by a person who had herself violated the law in doing so. *Bartnicki v. Vopper*, 532 U.S. 514, 534-35

Motion to Quash Admin Subpoena

Joshua Koltun ATTORNEY

(2001).  Thus, in *Alvarado v. KOB-TV, L.L.C.*, an unknown person leaked the fact that certain individuals were undercover policemen, information that allegedly threatened their lives and those of their families.  *Id.* 493 F.3d 1210, 1213-14 (10th Cir. 2007)  Nevertheless the First Amendment protected the right of the media to disclose their identities because the question whether the policemen were guilty of misconduct was an issue of public concern.  *Id.* at 1219-20. *cf. State ex rel. Cin. Enquirer v. Shanahan*, 2022-Ohio-448, ¶¶ 35-42 (Even if police office demonstrated that identifying him would put him in personal danger, he would not be allowed to proceed pseudonymously where his identity could be gleaned from public information).

Here, needless to say, neither Officer Simeon nor the other ICE/CBP agents are acting as undercover policemen, i.e. performing undercover work in the guise of civilians.  On the contrary, they are publicly executing arrests in the course of their duties, and wrongfully concealing their identities and declining to explain their actions to the arrestees.  That alone is an issue of public concern.  Moreover, their identities were determined by publicly available information, not through the disclosure of private confidential information.

### C.    LBRRN's characterization of ICE/CBP conduct as illegal – using terms such as kidnapping, assault, and terrorism -- is protected by the First Amendment

A statement of opinion is constitutionally protected if the underlying facts upon which it is based are disclosed, "no matter how unjustified and unreasonable the opinion may be or how derogatory it is." *See* Rest. of Torts (2d), § 566 (b) & (c).

Throughout her description and documentation of ICE/CBP conduct, LBRRN repeatedly characterizes the conduct as illegal, using terms such as "kidnapping," "terrorism," "assault" and so forth.  Whether the underlying conduct she describes is or is not, as a matter of law, "illegal" is irrelevant.  Any reasonable reader would recognize that her use of these terms is her own personal characterization of the underlying factual conduct that she is describing and documenting.  As such, readers are free to determine for themselves whether they consider her characterization to be hyperbolic or whether they consider it to be legally accurate.  Claims or characterizations of the legal consequences of certain facts are constitutionally protected opinions. *Coastal Abstract Serv. v. First Am. Title Ins. Co.*, 173 F.3d 725, 732 (9th Cir. 1999) (statement that entity that did not have a license

Joshua Koltun ATTORNEY

- 19 -

was acting "illegally."); *Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1104 (N.D. Cal. 1999) (claims that plaintiff was a "fraud" or "criminal" and "acted illegally" were constitutionally protected in light of the disclosure of the facts underlying the opinion.)

The First Amendment protects "vehement, caustic, [or] unpleasan[t]" opinions.. *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (citations omitted). In "public debate [we] must tolerate insulting, and even outrageous, speech in order to provide adequate 'breathing space' to the freedoms protected by the First Amendment." *Snyder* at 458 (quoting *Boos* v. *Barry*, 485 U.S. 312, 322 (1988)).

### D.    LBRRN's posts did not threaten Officer Simeon's safety

LBRRN has never threatened Officer Simeon's safety.  Much as DHS may consider videotaping the actions of ICE/CBP officers, vitriolically criticizing those actions, or identifying the masked officers as threatening, harassing, or "violence," the First Amendment protects these activities.  This is true even if there is some reasonable possibility that such activities might encourage some persons to actually act violently against the officers.

### 1.    LBRRN's posts did not constitute a "true threat" to Officer Simeon.

Many statements that may be considered "threatening" in some vague, colloquial sense are protected by the First Amendment, for example, " jests, "hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow."  *Counterman v. Colorado*, 600 U.S. 66, 74, (2023) (citation omitted).  Only "true threats" are unprotected by the First Amendment, in other words "serious expression[s]" conveying that a speaker means to "commit an act of unlawful violence." *Id.* For example, in *Watts v. United States*, the defendant, speaking at an anti-Vietnam war rally, stated that he had just gotten drafted but that he was "not going[; i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J.… they are not going to make me kill my black brothers."  *Id.,* 394 U.S. 705, 706 (1969)  The Supreme Court held that the statement should not be understood as a true threat, given the context of the overall antiwar speech," given that "debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 708.

Joshua Koltun ATTORNEY

In *Cook* the defendant, had been prosecuted and acquitted of drug possession, and had

subsequently made postings on Facebook concerning his public defenders, the judges, and law

enforcement agents involved in the case, essentially contending that he had been the victim of a

fraudulent indictment scheme, and including a statement that ""you are finished [, b]ecause I'm

coming and hell is coming with me," and disclosing the identity of undercover agents and the names

of his family members, along with a statement that "God willing I'm going to take them out." *Id.,* 472

F. Supp. 3d at 330-331.  The court ruled that the Facebook posts "lack entirely the specificity

required" to be considered a "true threat." *Id.* at 335.  "When read in context, Cook's posts are nothing

more than a manifesto of his grievances regarding people and processes which he perceived to have

wronged him." *Id.*  On the contrary, his comments were protected speech because they could "be

fairly considered as relating to any matter of political, social, or other concern to the community." *Id.*

at 336 (quoting *Snyder* 562 U.S. at 453).  "[W]here speech 'complained of misconduct within the

police department,' it should be classified as speech addressing a matter of public concern." *Id.*

(citation omitted).

### 2.    *LBRRN's post cannot be deemed to have incited others to harm Officer Simeon.*

The "the mere tendency of speech to encourage unlawful acts [is not] sufficient reason for

banning it." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002).  Although the term "incitement"

is used broadly in everyday speech, in the context of the First Amendment only a narrowly proscribed

set of speech is considered an incitement to violence that falls outside the protections of the

constitution.  The test was set out in *Brandenburg v. Ohio*, 395 U.S. 444, (1969).  The "constitutional

guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the

use of force or of law violation except where such advocacy is directed to inciting or producing

imminent lawless action and is likely to incite or produce such action." *Id.* at 447.  According to the

*Brandenberg* test, the First Amendment will protect speech, even speech that advocates violence,

unless it  all of the following: "(1) the speech explicitly or implicitly encouraged the use of violence

or lawless action, (2) the speaker intends that his speech will result in the use of violence or lawless

action, and (3) the imminent use of violence or lawless action is the likely result of his speech."

*Nwanguma v. Trump*, 903 F.3d 604, 609 (6th Cir. 2018).

The *Nwanguma* case is on all fours with this case..  Plaintiffs were protesters who appeared at a rally for then-candidate-for-President Trump.  Mr. Trump on five different occasions called upon his his supporters to "Get em' out of here," whereupon the protesters were allegedly assaulted, pushed and shoved.  *Id.* at 607.  The court held that the First Amendment immunized Mr. Trump from any liability for such violence.  *Id.* at 606.

The Court reasoned that, first although "Trump's words may *arguably* have had a tendency to encourage unlawful use of force, [] they did not specifically advocate for listeners to take unlawful action and are therefore protected."  *Nwanguma*, 903 F.3d at 610 (6th Cir. 2018) (original emphasis). Second, Mr. Trump had also admonished his supporters: "don't hurt 'em," which "undercut the alleged violence-inciting sense of Trump's words."  *Id.* at 611-12.

So too, here. LBRRN did not advocate violence against Officer Simeon (or any other Officer), let alone **imminent** violence.  Moreover, her "warning" post expressly disclaimed any such encouragement and on the contrary indicated that the readers should not "approach" Officer Simeon.

### *CONCLUSION*

Although the government has threatened to prosecute to the "full extent of the law" people like LBRRN who are documenting government conduct, "the full extent of the law" provides no basis for such prosecution.  Where there are no specific indications that conduct falls outside the protection of the First Amendment, the government is not entitled to investigate the conduct.  *Australia/Eastern U. S. A. Shipping Conference v. United States*, 1981 U.S. Dist. LEXIS 10121, at *50 (Dec. 23, 1981). "The intrusion is less justified in an investigation, where no alleged violations have been defined against which to measure the relevance of the disclosure, than it is in litigation."  *Id.*

The conduct the government proposes to investigate is fully protected by the First Amendment and therefore the subpoena must be quashed.

Respectfully submitted,

September 19, 2025

_____
/s/

Joshua Koltun
Attorney for Doe/LBRRN