EXHIBIT A

I was wrongly arrested by ICE. Racial profilings perpetuation



☰   San Francisco Chronicle

e-Edition     Account

**Trending:**   Live recall election results   |   Ex-KTVU anchor arrested   |   S.F. agency misspent $4M   |   S.F. foot traffic   |   Mall nearly empty   |   Hot weathe

OPINION // OPEN FORUM

# I'm a U.S. citizen who was wrongly arrested and held by ICE. Here's why you could be next

By **George Retes**

Sep 16, 2025

 Gift Article            

I was wrongly arrested by ICE. Racial profiling is a concern



California National Guard troops stand guard during a federal immigration raid at Glass House Farms in Camarillo (Ventura County) where George Retes was arrested on July 10.

Blake Fagan/AFP/Getty Images

🎧 Listen Now:  I'm a U.S. citizen who was wrongly arrested and held by ICE. Here's why you could be

1x

4:29

📊 Everlit

On July 10, I headed to my security guard job at a Camarillo (Ventura County) cannabis farm, not knowing that it was being raided by federal officials looking for immigration violations.

A 25-year-old American citizen, father of two and an Army veteran who served a tour in Iraq, it didn't occur to me that I was in any danger. As I approached the farm, a protest was underway, with cars bumper-to-bumper, and people walking along the sides of the street. Eventually, I came to a line of masked agents blocking the way.

As a contractor, if I don't make it to my job site, I don't get paid. I got out of my car and tried to explain that I was a U.S. citizen and an Army veteran just trying to get to my job.

**ADVERTISEMENT**

ADVERTISEMENT
Article continues below this ad

They didn't care.

When they started walking toward me, I got back in my car. But soon, they were banging on my door and gave opposing directions to "pull over to the side" and "reverse" while also trying to open my door. I was able to reverse and get out of the way, but then agents started using tear gas to disperse the protesters, which filled up my car and left me choking.

Again, they approached the car and told me to reverse, but I couldn't even see where I would be going. And again, agents contradicted themselves, telling me to back up and trying to open the door. Suddenly, an agent smashed my window and pepper-sprayed me. I was pulled from the car, and one agent knelt on my neck while another knelt on my back.

My wallet with my identification was in the car, but the agents refused to go look and confirm that I was a citizen. Instead, I sat in the dirt with my hands zip-tied with other detainees for four hours. When I was sitting there, I could hear agents asking each other why I had been arrested. They were unsure, but I was taken away and thrown in a jail cell anyway.

My first night in jail, my hands were burning from the pepper spray and tear gas because I was never allowed to wash them off. During the three nights and three days I was locked up and put on suicide watch, I could not make a phone call and was not given a chance to speak to a lawyer.

ADVERTISEMENT
Article continues below this ad

I was wrongly arrested by federal agents for racial profiling, persecution

I missed my daughter's third birthday party. Then I was just let go, with no charges, no explanation for why and no apology.

The Supreme Court recently permitted immigration agents to renew their aggressive tactics in California. To me, it feels like the system isn't working. By letting masked agents stop people based on how they look, talk or where they work, protection has become persecution.

I'm concerned that the court didn't have a full view of what is happening in our state. Justice Brett Kavanaugh wrote in his opinion that: "If the person is a U.S. citizen or otherwise lawfully in the United States, that individual will be free to go after the brief encounter."

My story shows that isn't true. It would have taken them two minutes to check my papers and confirm that I was a citizen. Instead, they arrested me because I was there.

That story isn't about left or right. It isn't about who you voted for or what side of the aisle you stand on. It's about something much deeper — the promise that in America, every person is supposed to be treated with dignity, fairness and respect.

I served my country. I wore the uniform, I stood watch, and I believe in the values we say make us different. And yet here, on our own soil, I was wrongfully detained. Stripped of my rights, treated like I didn't belong and locked away — all as an American citizen and a veteran.

This isn't just my story. It's a warning. Because if it can happen to me, it can happen to any one of us.

No matter your race, no matter your background, no matter your beliefs — none of us should have to fear being silenced, detained or dehumanized by the very government meant to protect us.

What happened to me is not right. And I will not stay quiet. There has been no apology or explanation. When reporters ask the Department of Homeland Security about my arrest, the answer is a vague statement about cases being reviewed for "potential federal charges."

Case 3:25-mc-80288 Document 3-1 Filed 09/20/25 Page 6 of 51

If no one is going to be held responsible, then I will demand justice in court. I've taken steps with the Institute for Justice to sue under the Federal Torts Claim Act, but I have to wait six months before I can actually file a lawsuit.

I'm taking a stand because justice doesn't belong to one side or the other — it belongs to all of us.

## About Opinion

Guest opinions in **Open Forum and Insight** are produced by writers with expertise, personal experience or original insights on a subject of interest to our readers. **Their views do not necessarily reflect** the opinion of The Chronicle editorial board, which is committed to providing a diversity of ideas to our readership.

*Read more about our transparency and ethics policies*

We must demand better. For me, for my children, for your families and for our neighbors who deserve to be treated as more than a number, more than a mistake, more than a file in a system.

This fight is bigger than me. It's about making sure that freedom, dignity and justice are not just words on paper, but lived truths for every single person in this country.

*George Retes is a U.S. citizen, an Army veteran and a security guard.*

Sep 16, 2025

**George Retes**

**More For You**

EXHIBIT B

# Congress of the United States

## Washington, DC 20515

August 8, 2025

Joseph V. Cuffari
Inspector General
U.S. Department of Homeland Security
245 Murray Lane SW
Washington, D.C. 20528

Troup Hemenway
Acting Officer for Civil Rights and Civil Liberties
U.S. Department of Homeland Security
2707 Martin Luther King, Jr. Avenue, SE
Washington, DC 20528

Joseph Guy
Director, Office of the Immigration Detention
Ombudsman
U.S. Department of Homeland Security
2707 Martin Luther King, Jr. Avenue, SE
Washington, D.C. 20528

Dear Inspector General Cuffari, Acting Officer Hemenway, and Director Guy:

We are increasingly concerned by reporting that U.S. citizens are being detained as a result of the Trump administration's immigration enforcement actions.[1] Sweeping enforcement operations by Department of Homeland Security (DHS) agents — particularly within Immigration and Customs Enforcement (ICE) — threaten the safety, due process, and civil liberties of Americans around the country. We echo other members of Congress who have expressed alarm about the apparent rise in indiscriminate immigration enforcement actions involving U.S. citizens.[2] We write to request that your offices, as DHS's internal oversight agencies,[3] investigate the Department's handling of these citizen encounters.

ICE policy makes clear that, "[a]s a matter of law, ICE cannot assert its civil immigration enforcement authority to arrest and/or detain a U.S. citizen."[4] However, in recent high-profile cases, ICE has erroneously arrested U.S. citizens, at times appearing to use violent physical

---

[1] CNN, "'We are not safe in America today:' These American citizens say they were detained by ICE," Alisha Ebrahimji, June 27, 2025, https://www.cnn.com/2025/06/27/us/american-citizens-detained-ice-immigration; Washington Post, "As Trump cracks down on immigration, U.S. citizens are among those snared," María Luisa Paúl, April 5, 2025, https://www.washingtonpost.com/immigration/2025/04/05/us-citizens-deported-immigration/.

[2] ProPublica, "Congress Has Demanded Answers to ICE Detaining Americans. The Administration Has Responded With Silence.," Nicole Foy, April 14, 2025, https://www.propublica.org/article/trump-ice-immigration-detained-americans-congress-questions-unanswered; Letter from Senator Mark Warner to DHS Secretary Kristi Noem, March 20, 2025, https://www.warner.senate.gov/public/_cache/files/f/7/f7540d7a-babf-41e8-8f34-7d79a0911289/B6EC35FEBDCAA111F2E6C5BAAC4C1B9BB128BD2D686082CD310E7EBDB952EA1B.2025.03.20-mrw-letter-to-dhs-and-ice-re-manassas-stop.pdf.

[3] While we direct this investigative inquiry to these offices, we are deeply concerned that DHS appears to have effectively gutted CRCL and OIDO. See CNN, "Cuts to DHS watchdogs spark more questions as deportation efforts increase," Angélica Franganillo Díaz, July 8, 2025, https://www.cnn.com/2025/07/08/politics/homeland-security-watchdog-cuts.

[4] U.S. Immigration and Customs Enforcement, Investigating the Potential U.S. Citizenship of

force.[5] ICE has also reportedly detained citizens in immigration detention facilities, sometimes for over a week.[6] ICE has even deported U.S. citizens: in multiple cases, ICE has deported U.S. citizen children along with their undocumented parents, reportedly against the families' wishes.[7] Particularly in Latino and Native American communities, Americans increasingly fear that their citizenship will not protect them from being swept up in DHS's immigration enforcement activities.[8]

ICE's policy further directs agents to "carefully and expeditiously investigate" citizenship claims and to "handle these matters with the utmost care and highest priority."[9] However, in multiple cases, ICE agents have reportedly not attempted to verify citizenship or ignored citizens' offers to show proof of citizenship.[10]

_____

Individuals Encountered by ICE, November 10, 2015, https://www.ice.gov/sites/default/files/documents/2017/16001.2.pdf.

[5] KTLA, "U.S. citizen released, no assault charges after violent ICE arrest in L.A. County," Lily Dallow, June 20, 2025, https://ktla.com/news/local-news/u-s-citizen-released-no-assault-charges-after-violent-ice-arrest-in-l-a-county/; Yahoo News, "US citizen caught in ICE raid says arrest was worth it if others got away," Isabel Keane, June 22, 2025, https://news.yahoo.com/us-citizen-caught-ice-raid-214300098.html; Fox 11 Los Angeles, " Family says US citizen was detained by ICE | FOX 11 LA," June 13, 2025, https://www.youtube.com/watch?v=GuM7BuXlXqQ.

[6] Mother Jones, "US Citizen Wrongly Detained by the Border Patrol Says Government's Account Is False," Judd Legum, April 23, 2025, https://www.motherjones.com/politics/2025/04/us-citizen-jose-hermosillo-wrongly-detained-ice-patrol-governments-account-false/.

[7] NBC News, "U.S. citizen children, including 4-year-old with cancer, taken to Honduras on mother's deportation flight, legal advocates say," Doha Madani, April 27, 2025, https://www.nbcnews.com/politics/immigration/two-children-us-citizens-4-and-7-year-old-deported-honduras-rcna203208; Children Thrive Action Network, "Children's Groups Outraged by Deportation of U.S. Citizen Children without Due Process," April 29, 2025, https://childrenthriveaction.org/2025/04/childrens-groups-outraged-by-deportation-of-u-s-citizen-children-without-due-process/; PBS, "Children who are U.S. citizens deported along with foreign-born mothers, attorneys say," Laura Barrón-López, Ian Couzens, Shrai Popat, April 28, 2025, https://www.pbs.org/newshour/show/children-who-are-u-s-citizens-deported-along-with-foreign-born-mothers-attorneys-say.

[8] NBC News, "Trump immigration raids snag U.S. citizens, including Native Americans, raising racial profiling fears," Suzanne Gamboa and Nicole Acevedo, January 28, 2025, https://www.nbcnews.com/news/latino/trump-immigration-raids-citizens-profiling-accusations-native-american-rcna189203; NBC Washington, "'Just following Hispanic people': Citizen detained by ICE questions vote for Trump," Jackie Bensen, March 6, 2025, https://www.nbcwashington.com/news/local/northern-virginia/just-following-hispanic-people-citizen-detained-by-ice-questions-vote-for-trump/3861172/; ACLU of New Mexico and New Mexico Immigrant Law Center, Indigenous Rights During ICE Encounters, May 13, 2025, https://nnhrc.navajo-nsn.gov/docs/Know-Your-Rights-during-ICE-Encounters.pdf; CNN, "Navajo Nation leaders raise alarm over reports of Indigenous people being questioned and detained during immigration sweeps," Alaa Elassar, January 27, 2025, https://www.cnn.com/2025/01/27/us/navajo-detained-ice-indigenous-immigration-trump/index.html; Axios, "ICE accused of racial profiling in detentions of Latino U.S. citizens," Russell Contreras, July 9, 2025, https://www.axios.com/2025/07/09/ice-us-citizens-detention-racial-profiling.

[9] U.S. Immigration and Customs Enforcement, Investigating the Potential U.S. Citizenship of Individuals Encountered by ICE, November 10, 2015, https://www.ice.gov/sites/default/files/documents/2017/16001.2.pdf.

[10] Washington Post, "As Trump cracks down on immigration, U.S. citizens are among those snared," María Luisa Paúl, April 5, 2025, https://www.washingtonpost.com/immigration/2025/04/05/us-citizens-deported-immigration/; Washington Post, "Man detained in Florida on immigration hold despite being citizen, lawyer says," Vivian Ho, April 18, 2025, https://www.washingtonpost.com/immigration/2025/04/18/florida-immigration-hold-lopez-gomez/.

DHS's actions can carry serious consequences for U.S. citizens. For example, American children detained and deported by DHS have missed months of school[11] or lost access to urgent cancer treatments and medications.[12]

Enforcement actions against U.S. citizens are not new.[13] For decades, ICE has arrested, detained, and even deported U.S. citizens,[14] a practice that the agency has acknowledged.[15] But under the second Trump administration, this rare practice is becoming more frequent. Experts warn that "citizens are becoming increasingly vulnerable in a system moving faster and operating with fewer safeguards."[16] The full scope of the problem remains unclear, largely due to ICE's poor record-keeping practices.[17] As of February 2025, ICE has reminded field offices to update citizenship data in agency databases,[18] but it is unclear whether agents are complying with that directive.

When immigration agents arrest Americans without sufficient cause or simply because they are near an enforcement action, detain them without access to counsel, or ignore proof of citizenship, DHS fails in its core duty to protect the public and undermines trust in its operations. Agency officials must be held accountable, and we ask that your offices — the Office for Civil Rights and Civil Liberties (CRCL), Office of Inspector General (DHS OIG), and Office of the Immigration Detention Ombudsman (OIDO) — investigate these encounters and determine whether DHS is violating Americans' civil rights. Please address the following questions in your investigation and provide a briefing to our offices about this issue by September 5, 2025:

---

[11] Washington Post, "As Trump cracks down on immigration, U.S. citizens are among those snared," María Luisa Paúl, April 5, 2025, https://www.washingtonpost.com/immigration/2025/04/05/us-citizens-deported-immigration/.

[12] The Washington Post, "Here are the U.S. citizens caught in Trump's immigration crackdown," María Luisa Paúl, May 3, 2025, https://www.washingtonpost.com/immigration/2025/05/02/citizens-caught-trump-immigration-crackdown/; Letter from Texas Civil Rights Project to U.S. Department of Homeland Security, March 17, 2025, https://www.txcivilrights.org/_files/ugd/9fea3a_ae52f88df10742f99362e3c14b452213.pdf.

[13] Government Accountability Office, Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations, July 2021, https://www.gao.gov/assets/gao-21-487.pdf; ProPublica, "Some Americans Have Already Been Caught in Trump's Immigration Dragnet. More Will Be.," Nicole Foy, March 18, 2025, https://www.propublica.org/article/more-americans-will-be-caught-up-trump-immigration-raids; SSRN, "U.S. Government Unlawfully Detaining and Deporting U.S. Citizens as Aliens," Jacqueline Stevens, September 22, 2011, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1931703; Los Angeles Times, "ICE held an American man in custody for 1,273 days. He's not the only one who had to prove his citizenship," Paige St. John and Joel Rubin, April 27, 2018, https://www.latimes.com/archives/story/2018-04-27/ice-held-an-american-man-in-custody-for-1273-days.

[14] Economic Times, "ICE in hot water: Dozens of US citizens wrongfully deported in shocking immigration blunder," June 24, 2025, https://economictimes.indiatimes.com/news/international/us/ice-in-hot-water-dozens-of-us-citizens-wrongfully-deported-in-shocking-immigration-blunder/articleshow/122052145.cms?from=mdr.

[15] Government Accountability Office, Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations, p. 14, July 2021, https://www.gao.gov/assets/gao-21-487.pdf.

[16] Washington Post, "Here are the U.S. citizens caught in Trump's immigration crackdown," María Luisa Paúl, May 3, 2025, https://www.washingtonpost.com/immigration/2025/05/02/citizens-caught-trump-immigration-crackdown/.

[17] Id.

[18] Government Accountability Office, "Immigration Enforcement: Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations," July 20, 2021, https://www.gao.gov/products/gao-21-487 (explaining a February 2025 status update related to one of GAO's recommendations).

1. We request that DHS produce all policies and guidelines provided to DHS agents performing immigration enforcement functions regarding the arrest or detention of U.S. citizens under the second Trump administration.

2. Does DHS track how many U.S. citizens it stops, arrests, detains, or deports?
   a. How many U.S. citizens have been stopped, arrested, detained, or placed in removal proceedings by ICE, CBP, or other DHS agents in 2025? Please provide a breakdown by month, location, reason for enforcement action, outcome, and length of time in ICE custody.

3. What specific policies or protocols are in place to prevent the holding, arrest, or detention of U.S. citizens during immigration enforcement operations, and how are those policies enforced in real time?

4. Does DHS require agents to update records once U.S. citizenship is confirmed?
   a. If not, why not?
   b. If so, how does DHS ensure compliance?

5. How are DHS agents trained to verify when an individual asserts U.S. citizenship?
   a. What steps are taken when a detained individual asserts U.S. citizenship, and how quickly is the claim reviewed?
   b. What documentation or evidence is considered sufficient to verify citizenship status?
   c. How long on average does it take to verify citizenship?
   d. What consequences do DHS employees face if they fail to verify assertions of U.S. citizenship in a timely fashion?

6. Have your offices reviewed or investigated wrongful detentions of U.S. citizens?
   a. If so, what were your findings and recommendations? Have any disciplinary actions resulted?
   b. Please specify details of any wrongful detention of U.S. citizens and any disciplinary consequences, as well as any circumstances where alleged wrongful detentions were not investigated or reviewed.

7. What training, if any, do ICE, CBP, and other DHS agents receive regarding the constitutional rights of U.S. citizens, lawful permanent residents, and others who are lawfully present in the United States — particularly related to due process, unlawful search and seizure, and equal protection under the law?

8. Since January 2025, how many complaints have your offices received alleging racial profiling or other impermissible targeting by DHS agents?
   a. Please describe your process for investigating such complaints.
   b. How many of those complaints were investigated by OIG, CRCL, and/or OIDO?
   c. How many complaints were referred to ICE or CBP for further investigation?

9. Please describe CRCL's and OIDO's current capacity to conduct retained investigations or review referred investigations' findings, including current staffing levels in CRCL's compliance branch and OIDO.

Thank you for your attention to this important matter.

Sincerely,


Elizabeth Warren
United States Senator


Dan Goldman
Member of Congress


Alex Padilla
Ranking Member, Judiciary
Subcommittee on Border
Security and Immigration


J. Luis Correa
Member of Congress


Mark Kelly
United States Senator


Richard J. Durbin
United States Senator


Ron Wyden
United States Senator


Henry C. "Hank" Johnson, Jr.
Member of Congress


Jared Huffman
Member of Congress


Eric Swalwell
Member of Congress

Paul D. Tonko
Member of Congress

Grace Meng
Member of Congress

Judy Chu
Member of Congress

Nikema Williams
Member of Congress

Frederica S. Wilson
Member of Congress

Nydia M. Velázquez
Member of Congress

Becca Balint
Member of Congress

Jan Schakowsky
Member of Congress

Ritchie Torres
Member of Congress

Al Green
Member of Congress

Yvette D. Clarke
Member of Congress

Lateefah Simon
Member of Congress

Val Hoyle
Member of Congress

Greg Casar
Member of Congress

Delia C. Ramirez
Member of Congress

Lloyd Doggett
Member of Congress

Suhas Subramanyam
Member of Congress

Madeleine Dean
Member of Congress

Eleanor Holmes Norton
Member of Congress

Raja Krishnamoorthi
Member of Congress

Alexandria Ocasio-Cortez
Member of Congress

Maxine Dexter
Member of Congress

Dina Titus
Member of Congress

Adam B. Schiff
United States Senator

Seth Magaziner
Member of Congress

Jesús G. "Chuy" García
Member of Congress

Laura Friedman
Member of Congress

Sylvia R. Garcia
Member of Congress

Sarah McBride
Member of Congress

Shri Thanedar
Member of Congress

Timothy M. Kennedy
Member of Congress

Bernard Sanders
United States Senator

Veronica Escobar
Member of Congress

Kirsten Gillibrand
United States Senator

Jonathan L. Jackson
Member of Congress

Ro Khanna
Member of Congress

Richard Blumenthal
United States Senator

Donald S. Beyer Jr.
Member of Congress

Dave Min
Member of Congress

Mark R. Warner
United States Senator

EXHIBIT C

Case 3:25-mc-80288    Document 1-1    Filed 09/20/25    Page 17 of 51



Immigration Reform    Government Shutdown    National Security    Tariffs    Elections

Issues      Experts      Events      Press      Take Action      About Us                                Donate ↗

REPORT    AUG 28, 2025

# Masked and Unidentifiable: The Risks of Federal Law Enforcement Operating Without Identification

AUTHOR



Allie Preston

Advancing Racial Equity and Justice, Domestic Policy, Immigration,    +3 More

Since taking office, the Trump administration has undermined public safety and law enforcement accountability by supporting the dangerous practice of obscuring the identity of ICE and other federal officers.

Federal agents working for U.S. Immigration and Customs Enforcement are seen in the Jacob K. Javits Federal Building in New York, New York, July 24, 2025. (Getty/Dominic Gwinn)

In recent months, federal U.S. Immigration and Customs Enforcement (ICE) and other federal law enforcement officers—roaming the streets in plainclothes, masked, and sometimes armed—have stoked fear in communities nationwide. These federal agents have been seen swinging batons, smashing car windows, using explosives to blow the door off of a home with children inside, emerging from unmarked vehicles with weapons drawn, shooting into a family vehicle, and grabbing people off of the street and putting them into unmarked vehicles. In cities such as Los Angeles, Minneapolis, Phoenix, and Miami, officers donning face coverings without an agency designation and driving unmarked vehicles have conducted immigration enforcement actions at schools, courthouses, religious institutions, and work sites. Meanwhile, in Washington, D.C., hundreds of officers from nearly 20 federal agencies, D.C. National Guard troops, and National Guard troops from six other states have been deployed to the streets, with masked U.S. Department of Homeland Security (DHS) agents manning checkpoints for drivers. This is the new, frightening image of U.S. immigration enforcement under President Donald Trump: violence, covered faces, and unknown agency affiliations. These images signal a troubling move "away from democratic controls," where officers are visible and accountable to the communities they serve, and toward militarization that serves to instill fear and stifle dissent.

Enforcement actions by masked or unidentifiable officers, which have even included the arrests of elected officials and other U.S. citizens, are part of a broader effort to keep up with arbitrary and cruel immigration arrest quotas set by the Trump administration. As a result, today, ICE is operating in ways akin to the actions of secret police forces, tasked with carrying out Trump's political agenda. These practices have stoked fear in communities across the country and raised serious questions about the safety and legitimacy of their operations under the Trump administration.

---



# This is the new, frightening image of U.S. immigration enforcement under the Trump administration: violence, covered faces, and unknown agency affiliations.

Amid public outcry, attorneys general, members of Congress, and former military and law enforcement officers have joined in to amplify concerns about the rise of these dangerous practices. Recently, attorneys general from 21 different states called on Congress to pass legislation that both prohibits federal agents from wearing face coverings to conceal identity and implements requirements for showing identification and agency designation. In addition to potentially violating federal law, officers operating without providing their agency or personal identifiers make everyone less safe—from law enforcement to civilians to entire communities. The presence of unidentifiable officers makes policing more challenging and dangerous, as community members or fellow officers may mistake them for a lawbreaker. Moreover, this practice spurs dangerous impersonations, impedes accountability for officers who are engaged in misconduct, and undermines trust in law enforcement.

9/19/25, 8:12 PM
Case 3:25-mc-80288 — Document 1-1 — Filed 09/20/25 — Page 19 of 51
Masked and Unidentifiable: The Risks of Federal Law Enforcement Operating Without Identification - Center for American Progress

Actions must be taken by legislators and other policymakers at the federal and state levels to curtail these dangerous practices and ensure that all law enforcement officers are properly identifiable as they go about their jobs, unless there is a legitimate reason not to be.

## ICE officers are using multiple tactics to obscure their identity from the public

Since President Trump took office, ICE officers have been seen making immigration arrests wearing plainclothes and without a personal identifier and have refused to identify themselves upon request from community members. While there is no standard uniform for ICE agents, recent months have seen an increase in ICE and federal law enforcement officers assisting in immigration enforcement using tactics to obscure their faces and designation. ICE and other accompanying federal law enforcement have begun regularly wearing ski masks, balaclavas, and gaiters as a way to prevent themselves from being identified and, by extension, limit transparency and accountability. In Arizona, for example, officers allegedly posed as utility workers to gain access to someone's home. In many of these and other instances, officers' tactics during arrests, including the use of force, have instilled fear among immigrant and nonimmigrant communities alike, while also raising serious public concerns more broadly.

It is true that there are times when it may be appropriate, even necessary, for law enforcement officers to wear plainclothes, don a face covering, or hide their identity. For example, there are instances when someone may be working undercover, protecting themself from illness or an environmental condition such as a fire or chemical spill, or working on a case related to an organized crime entity where there is a credible threat of retaliation. However, these concerns typically do not arise in the types of immigration enforcement actions that many ICE officers are now engaged in, which often involve apprehending parents, college students, and community members with no criminal convictions or connections to criminal organizations. In fact, the practice of masking and hiding identifiers can jeopardize the safety of ICE and other federal law enforcement officers by making it harder for other officers or community members to identify them as law enforcement and interact with them accordingly.

 

---

## Federal law enforcement should be held to the same standard of good policing as local officers to ensure that policing is safe, transparent, and accountable.

Some claim that masks are used by officers to protect against doxxing, a practice whereby people's personal information is shared, often online, as a precursor to harassment. While any real threats to officer safety should be taken seriously, there are thankfully already mechanisms at the federal and state levels aimed at protecting officers from these harmful acts.

Every day, law enforcement officers across the country get dressed in their uniforms to fulfil their duties and serve their communities. This includes state and local law enforcement officers, who are participating in work that may have greater risks than immigration enforcement. Federal law enforcement should be

held to the same standard of good policing as local officers to ensure that policing is safe, transparent, and accountable.

### Legal requirements related to the identification of ICE and other federal law enforcement

Depending on the circumstances of the arrest, federal law enforcement officers may be in violation of federal law if they fail to properly identify themselves. According to Title 8 § 287.8, "only designated immigration officers are authorized to make an arrest," and they are required to identify themselves as an immigration officer as soon as it is "practical and safe." Recent reporting has noted that officers making arrests have failed to identify themselves or their agency in instances when it was "practical and safe" even when asked directly, potentially violating this provision.

Additionally, in an unusual move, the Trump administration deployed ICE agents and other federal law enforcement officers in response to protests in cities such as Los Angeles and to arrest protestors in cities such as Omaha, Nebraska. Under 10 USC 723, federal agents responding to "civil disturbances" must, likewise, "visibly display" IDs and agency affiliation, unless exempted. With the recent federal enforcement activities at protests, it is possible that officers who concealed their identity or agency may have violated this provision.

## Safety concerns raised by masked and undesignated law enforcement

In addition to potentially violating the legal requirements stated above, federal law enforcement officers who carry out their jobs with their faces covered or without properly identifying themselves can create serious safety concerns for law enforcement and community members alike.

### Unidentified officers face significant risk of friendly fire and other violent escalations, while also hindering accountability and eroding community trust

Law enforcement uniforms were created, in part, to keep officers safe. Uniforms are a visual representation of officers' authority and help to influence the ways in which others interact with them. Unidentified officers conducting enforcement actions in plainclothes can increase the chances of tragic "blue-on-blue," friendly fire incidents, where one officer accidentally shoots another. Since federal agents typically do not notify local law enforcement when federal officers are operating in their community, the risk to officers is exacerbated.

A lack of proper identification can also lead to unnecessary escalations in the community. Without seeing an officer's agency designation or identification, people may refuse directives, since they, reasonably, may not believe that a group of strangers in masks and plainclothes are actually the officers they claim to be. Neighbors, loved ones, or other bystanders who witness an enforcement action may believe that someone is being harmed, causing them to intervene or call the police. The inability to determine whether individuals grabbing people off of the street and throwing them into unmarked cars are legitimate officers or lawbreakers has already led many community members to call on state and local enforcement for help during events that they believe to be kidnappings. Masking instills fear in communities, undermines trust between residents and law enforcement and hinders accountability. It limits the cooperation between law

9/19/25, 8:12 PM                    Masked and Unidentifiable: The Risks of Federal Law Enforcement Operating Without Identification - Center for American Progress

Case 3:25-mc-80288    Document 1-1    Filed 09/20/25    Page 21 of 51

enforcement and communities that officers rely on to do their jobs. These types of intimidation tactics are also a common tool of authoritarians who seek to stifle dissenting voices and quell opposition to their agenda.

## Widespread masking and obscuring of officer agency and identity encourages dangerous impersonations

One of the most troubling trends that has followed this wave of unidentifiable law enforcement is the rise of vigilantes and dangerous impersonations. People with insidious motives have taken advantage of the widespread deployment of masked immigration officers as cover to allegedly harass civilians or commit violent crimes such as kidnapping, robbery, and sexual assault:

- In North Carolina, a man was arrested for sexual assault and impersonating an officer after he allegedly threatened to deport a woman if she did not have sex with him.

- In Pennsylvania, an impersonator with gear to make him look like law enforcement went to an auto repair shop, where he allegedly threatened to arrest employees; zip-tied the hands of one of the employees; and ultimately left, stealing almost $1,000.

- In California, an investigation into an illegally parked car revealed a stash of "law enforcement-style equipment," multiple passports, and documents with Homeland Security Investigations and U.S. Customs and Border Patrol (CBP) letterhead in a car belonging to someone with a prior arrest for human smuggling.

The rise in impersonations has been so alarming that it has led California Attorney General Rob Bonta and a college campus to put a notice out to their communities. It has also spurred the introduction of state-level bills to clarify laws related to impersonation or increase penalties for impersonating an officer in particular instances. Ensuring that officers are identifiable protects communities by making it easier to distinguish between legitimate officers and impersonators.

## Deploying unidentified officers impedes accountability

Community members must be aware of an officer's identity and agency affiliation in order to know their rights and understand the authority that the officer has to engage with them. Different law enforcement officers have different levels of authority to make arrests and enter certain spaces. Knowing the agency is also important for families and friends who are working to find their loved ones after an arrest.

This is a serious concern now that the Trump administration has ordered agents from other federal agencies not usually engaged in immigration—including from the FBI, the U.S. Marshals Service, the U.S. Drug Enforcement Agency, and the Bureau of Alcohol, Tobacco, and Firearms—to participate in enforcement activities. Without knowledge of the agency or individual officers who are engaging in enforcement in their communities, there is no way for people to report or hold officers accountable for unprofessional behavior or misconduct, even in instances that may involve violence or illegal activity.

9/19/25, 8:12 PM

Case 3:25-mc-80288    Document 1-1    Filed 09/20/25    Page 22 of 51

Masked and Unidentifiable: the Risks of Federal Law Enforcement Operating Without Identification - Center for American Progress

# Key components of legislation to curb widespread masking and require identification of ICE and other federal officers

Accountability and oversight are needed to protect communities from the wave of masked, unidentifiable federal law enforcement officers who are violently arresting residents across the country—as well as from the opportunistic impersonators who have taken advantage of this new trend to commit violence and other crimes. Congress should heed the calls of 21 attorneys general to pass legislation that both prohibits the wearing of face coverings to conceal officers' identities and implements requirements for visible personal identification and agency designation. As Congress and state legislatures work to curtail these harmful practices, they should consider key components of proposed laws or existing legislation.

## Restricting the use of nonmedical masks and facial coverings

Legislators should seek to create clear guidelines to limit the use of masks and other face coverings to clearly defined circumstances. While the circumstances are limited, proposals to prohibit law enforcement from wearing face coverings should include narrow exceptions that allow officers to wear masks to protect the integrity of an undercover operation, prevent the spread of illness, or guard against environment hazards.

> **Examples**                                                              ⌄
>
> ■ Under the proposed Visible Identification Standards for Immigration-based Law Enforcement (VISIBLE) Act, officers are prevented from wearing nonmedical face coverings unless they are "operationally necessary" for a covert operation or to protect against an environmental hazard.
>
> ■ Legislators in California, New York, Massachusetts, and Tennessee have introduced legislation to create appropriate restrictions on masks and face coverings, while legislators in Pennsylvania have signaled their plans to put forth a similar proposal.

## Requiring officers to clearly display agency designation and identification

Requiring officers to have visible identification that includes both an agency designation and a name or badge number as a personal identifier helps to protect against impersonations, allows residents to assess their rights and responsibilities when engaging with officers, and ensures that residents have the information they need to report misconduct and seek accountability.

9/19/25, 8:12 PM        Masked and Unidentifiable: The Risks of Federal Law Enforcement Operating Without Identification - Center for American Progress

Case 3:25-mc-80288    Document 1-1    Filed 09/20/25    Page 23 of 51

**Examples** ⌄

- Legislators have included these requirements in multiple federal bills, as well as bills in California and New York.

- DHS should implement a standard uniform for ICE Enforcement Removal Operations officers, who are primarily responsible for immigration enforcement operations.

## Implementing a duty to intervene or mandatory reporting related to mask use and identification

Like the existing duty to intervene and report excessive use of force, legislation should create a duty to intervene and reporting requirements when officers are using prohibited face coverings or failing to identify. Legislation should include requirements for training on this duty to ensure that it is properly followed.

**Examples** ⌄

- In New York, the Mandating End of Lawless Tactics (MELT) Act would create a state requirement for ICE to report mask use, among other things.

- In the absence of a federal requirement, states could pass laws creating a duty for their officers to intervene when interacting with federal law enforcement.

## Creating accountability and enforcement mechanisms

To ensure that new policies are enforced and that officers are held accountable, legislators can create requirements that agencies have written policies related to masking and identification. In the event that these policies are violated, procedures should be established for accountability.

**Examples** ⌄

- The No Vigilantes Act in California requires agencies to have written policies related to masking and identification, with any violation of its provisions amounting to a misdemeanor.

- The federally proposed VISIBLE Act requires DHS to create disciplinary procedures for violations of its identification provisions, investigate complaints, and report violations to Congress.

### Ensuring that laws related to identification apply to all necessary contexts

Some legislation related to masking and identification only applies in certain circumstances. Legislators should ensure that the scope of these requirements is broad enough to cover all the situations in which officers are being deployed.

---

**Examples**                                                                  ⌄

- For example, Congress should expand the parameters of 10 USC 723, requiring officers to visibly display personal identifiers and agency affiliation. Currently, 10 USC 723 only applies to instances where federal agents are responding to a "civil disturbance." The scope of this requirement should be expanded to include what is now a more common task across federal agencies: immigration enforcement.

- H.R. 3172 creates requirements for CBP and ICE agents and other officers deputized by DHS to have "bold and visible identification."

---

### Nonlegislative state-level actions to guard against harmful masking and identification practices by ICE and other federal law enforcement

States are already exploring nonlegislative tactics to prevent and guard against the harms of unidentifiable federal law enforcement. A coalition of 21 state attorneys general wrote to Congress, urging it to pass legislation that would prohibit the use of masks and require federal officers to display their agency. Attorneys general from other states can join this movement and put additional pressure on Congress to act. State attorneys general can also issue legal guidance to both their residents and law enforcement. Earlier this year, New York Attorney General Letitia James issued guidance to "clarify the rights and obligations of employers and workers" during workplace immigration enforcement actions, including advising employers of their ability to request identification of ICE officers. In Baltimore, Maryland, the chief judge issued an administrative order requiring that any law enforcement coming into the court first check in with the Baltimore City Sheriff's Office onsite and wear their agency uniform or "prominently display" their identification or badge.

# Conclusion

The rise of masked and unidentifiable federal law enforcement conducting immigration enforcement is dangerous for officers and communities alike. This trend instills fear and breaks down trust between law enforcement and the community. These tactics also reduce the government's accountability to the public and serve to instill fear and stifle dissenting voices from speaking out in opposition.

Across the country, state and local law enforcement officers respond to calls, including those related to crime and violence, in communities every day. Most of these officers are unmasked and in uniform and display information related to their agency affiliation and personal identity. Federal agents engaged in immigration enforcement should be held to the same standards. Action at the federal, state, and local levels is both urgent and necessary to ensure that federal law enforcement is identifiable and accountable to communities.

## Acknowledgments

The author would like to acknowledge Dan Herman and Rachael Eisenberg of the Center for American Progress for their consultation on this issue brief. The author would also like to acknowledge Devon Ombres, Hayley Durudogan, Debu Gandhi, and Silva Mathema from the Center for American Progress as well as Tahir Duckett from the Georgetown University Center for Innovations in Community Safety for their advice and feedback during the development of this issue brief.

The positions of American Progress, and our policy experts, are independent, and the findings and conclusions presented are those of American Progress alone. American Progress would like to acknowledge the many generous supporters who make our work possible.

AUTHOR

### Allie Preston

Senior Policy Analyst, Criminal Justice Reform

TEAM

### Criminal Justice Reform

We focus on developing policies to shrink the justice system's footprint, improve public health and safety, and promote equity and accountability.

## ALSO FROM CAP

9/19/25, 8:12 PM
Masked and Unidentifiable: The Risks of Federal Law Enforcement Operating Without Identification - Center for American Progress
Case 3:25-mc-80288    Document 1-1    Filed 09/20/25    Page 26 of 51

REPORT

**Congressional Republicans' One Big Beautiful Bill Act Creates an Unaccountable Slush Fund for the Trump Administration's Deportation Force**

REPORT

**The Corporate Power Reset That Makes *Citizens United* Irrelevant**

ARTICLE

**A Green Light for Authoritarianism: How the Trump Administration Fuels Global Autocracy**

ARTICLE

**5 Ways the Trump Administration Is Driving Up Health Care Costs for Families**

Sep 19, 2025

Rosa Barrientos-Ferrer, Ben Greenho, Silva Mathema

Sep 15, 2025

Tom Moore

Sep 19, 2025

Dan Herman, Robert Benson

Sep 18, 2025

Natasha Murphy



The Center for American Progress is an independent nonpartisan policy institute that is dedicated to improving the lives of all Americans through bold, progressive ideas, as well as strong leadership and concerted action. Our aim is not just to change the conversation, but to change the country.



anProgress
**Stay informed on the most pressing issues of our time.**

| Email Address | SUBMIT |
|---|---|



Learn about our sister organization, the Center for American Progress Action Fund, an advocacy organization dedicated to improving the lives of all Americans.

©2025 Center for American Progress

Terms of Use
Privacy Policy
CAP - En Español
Our Supporters

EXHIBIT D

9/16/25, 3:09 PM
Case 3:25-mc-80288 — Document 3-1 — Filed 09/20/25 — Page 29 of 51
California lawmakers pass bill to bar ICE agents from wearing masks | AP News



**You might be interested** downtownlaw.com

LIVE:
**Trump administration**

LIVE:
**Israel strikes Gaza City**

Luigi Mangione     Costco Prosecco recall     Coachella 2026 lineup

# California lawmakers pass bill barring authorities from wearing face masks



Law enforcement officers stand guard during a protest June 14, 2025, in Los Angeles. (AP Photo/Eth... Read More

BY TRÂN NGUYỄN
Updated 1:49 PM PDT, September 12, 2025

SACRAMENTO, Calif. (AP) — California state lawmakers have passed legislation that would ban most law enforcement officers from covering their faces while carrying out operations, a response to immigration raids in Los Angeles.

But even if the governor signs the measure into law, it's unclear whether federal agents who have been carrying out those raids.

It is the first such bill to be approved by a state legislature, though Democrats in Congress and lawmakers in several states, including Tennessee, Michigan, Illinois, New York, Massachusetts, and Pennsylvania, have

AdChoices

Alma     Skip Ad ▶️


introduced similar proposals calling for mask bans for law enforcement officers.

California's legislation, approved in the Democratic-controlled Legislature on Thursday, is among a number of bills state lawmakers were considering this year in response to the immigration raids.

ADVERTISEMENT



The bill would prohibit neck gator, ski masks and other facial covering for local and federal officers, including immigration enforcement agents, while they conduct official business. It makes exceptions for undercover agents, medical masks such as N95 respirators or tactical gear.

---

**RELATED STORIES**



**California Legislature approves bill to require immigration enforcement alerts at schools**

**California Democrats push to redraw congressional districts**



**Chicago in Trump's sights for next immigration crackdown**

Gov. Gavin Newsom has about a month to decide whether to sign it into law. The Democratic governor has criticized federal agents' use of masks while [making arrests](#) but in July also questioned the state's authority over federal agents. His office said Friday it does not typically comment on pending legislation.

> ▶ *Stay up to date with the latest U.S. news by signing up to our WhatsApp channel.*

Proponents of the bill said the proposal is necessary, especially after the Supreme Court earlier this week [ruled that the federal administration can resume](#) the sweeping immigr— the state of Los Angeles.

Assemblymember Juan Carrillo, vice chair of the Latino caucus, said th—federal agents stop suspects based solely on their race, language, or jo—

AdChoices ▷

Skip Ad ▶|

ADVERTISEMENT

9/16/25, 3:09 PM
California lawmakers pass bill to bar ICE agents from wearing masks | AP News
Case 3:25-mc-80288 Document 3-1 Filed 09/20/25 Page 33 of 51



"How is anyone supposed to reasonably believe that they are law enforcement officers and not masked individuals trying to kidnap you?" he said prior to the vote. "Imagine the absolute fear of being pulled over at gunpoint by a group of masked individuals."

Supporters also cited an opinion from constitutional law expert Erwin Chemerinsky at the University of California, Berkeley to defend the proposal. A state cannot directly regulate the federal government, he wrote in an opinion piece for the Sacramento Bee, but that does not mean federal employees do not have to follow state rules "unless doing so would significantly interfere with the performance of their duties. For example, while on the job, federal employees must stop at red lights."

"ICE agents have never before worn masks when apprehending people, and that never has posed a problem. Nor have other officers of local, state and federal law enforcement faced dangers from the public because they don't wear masks in the streets," he wrote.

Republican lawmakers and law enforcement agencies said the legislation would only make the job more dangerous for officers.

ADVERTISEMENT



"Bad guys wear masks because they don't want to get caught. Good guys [...] want to get killed," said state Republican Sen. Kelly Seyarto on Thursda[...]

The increase in high-profile immigration enforcement was already contentious between those opposed to the actions of Trump's administration and those in support of them. The sight of masked agents carrying it out is creating a whole new level of conflict, in a way that has no real comparison in the U.S. history of policing.

Trump administration officials have consistently defended the practice, saying that immigration agents have faced strident and increasing harassment in public and online as they have gone about their enforcement in service of Trump's drive toward mass deportation, and hiding their identities is for their and their families' safety.

Democrats and others, including several state attorneys general, have pushed back, saying the use of face masks generates public fear and should be halted.



### TRÂN NGUYỄN

Nguyễn is an Associated Press reporter covering California government and politics.





ADVERTISEMENT

**MOST READ**



EXHIBIT E



# THE UNITED STATES OF AMERICA

**I-797 | NOTICE OF ACTION** | DEPARTMENT OF HOMELAND SECURITY
U.S. CITIZENSHIP AND IMMIGRATION SERVICES



| Receipt Number<br>LIN2211550057 | USCIS Account Number | Case Type<br>I765 - APPLICATION FOR EMPLOYMENT AUTHORIZATION |
|---|---|---|
| Received Date<br>11/08/2021 | Priority Date | Applicant  A220 013 120<br>RODRIGUEZ TORRES, J JESUS |
| Notice Date<br>08/31/2024 | Page<br>1 of 1 | |

| | |
|---|---|
| LUTIN LAW GROUP<br>c/o SULIANA LUTIN<br>1501 E ORANGETHORPE AVE STE 100<br>FULLERTON  CA  92831 | **Notice Type:** Approval Notice<br>Class: C14<br>Valid from 08/31/2024 to 08/30/2028 |

**We have approved your application for employment authorization.** We will send your Employment Authorization Document (EAD) (also known as an EAD card or Form I-766) to you separately. Your EAD card should be produced within one to two weeks. Your EAD card will be mailed via U.S. Postal Service (USPS) Priority Mail with Delivery Confirmation to the address you designated. The time frame in which you will receive your EAD card may vary, depending on USPS delivery times. Please allow a total of 30 days from approval before inquiring with USCIS. We encourage you to use Case Status Online https://egov.uscis.gov/ to find your USPS tracking number for EAD card delivery. If you have not received your EAD card within this time frame, please visit https://egov.uscis.gov/e-request/Intro.do for instructions on how to submit an inquiry.

Your EAD card is proof that you are allowed to work in the United States. Show the card to your employer to verify your authorization to work during the dates on the card. You cannot use this approval notice as proof of your employment authorization.

When you receive your EAD card, please check that all the information on the card is correct. If you need to change any information on the card, please mail all of the following to the office listed below:

- A letter explaining what information needs to be corrected,
- Your EAD card,
- A photocopy of this notice, and
- Evidence to show what the correct information should be. For example, if you need to correct your name, submit a copy of your birth certificate or official name change.

If You Have a Pending Form I-485

If you have a pending or approved Form I-140 and a pending Form I-485, you may request to change employers if your Form I-485 has been pending for at least 180 days. In order to do so, you need to submit documentation about your new job offer. For more information on how to request a change of employers and what information you must submit, please visit the USCIS website at www.uscis.gov.

If your EAD card expires before we make a final decision on your Form I-485, you may apply for a new EAD card.

**THIS FORM IS NOT A VISA AND MAY NOT BE USED IN PLACE OF A VISA OR EVIDENCE OF EMPLOYMENT AUTHORIZATION.**

**NOTICE:** Although this application or petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify this information before and/or after making a decision on your case so we can ensure that you have complied with applicable laws, rules, regulations, and other legal authorities. We may review public information and records, contact others by mail, the internet or phone, conduct site inspections of businesses and residences, or use other methods of verification. We will use the information obtained to determine whether you are eligible for the benefit you seek. If we find any derogatory information, we will follow the law in determining whether to provide you (and the legal representative listed on your Form G-28, if you submitted one) an opportunity to address that information before we make a formal decision on your case or start proceedings.

---

Please see the additional information on the back. You will be notified separately about any other cases you filed.

**USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online.**

Nebraska Service Center
U.S. CITIZENSHIP & IMMIGRATION SVC
P.O. Box 82521
Lincoln NE 68501-2521

**USCIS Contact Center: www.uscis.gov/contactcenter**





## THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.

| Receipt Number<br>LIN2115151517 | | Case Type<br>I918A - PETITION FOR QUALIFYING FAMILY MEMBER OF U-1 RECIPIENT |
|---|---|---|
| Received Date<br>03/03/2021 | Priority Date | Applicant  A220 013 119<br>RODRIGUEZ , MARTINA |
| Notice Date<br>08/31/2024 | Page<br>1 of 1 | Beneficiary  A220 013 120<br>RODRIGUEZ TORRES , J JESUS |

LUTIN LAW GROUP
c/o SULIANA LUTIN
1501 EAST ORANGETHORPE AVE STE 100
FULLERTON CA  92831

**Notice Type:** Bona Fide Determination Notice

### CORRESPONDENCE

On 03/03/2021, you submitted a Form I-918, Supplement A, Petition for Qualifying Family Member of U-1 Recipient (Form I-918, Supplement A) for your family member. In order to approve a Form I-918, Supplement A, the principal's petition for U Nonimmigrant Status (Form I-918) must first be approved. As the statutory cap for U-1 nonimmigrant status has been reached for this fiscal year, U.S. Citizenship and Immigration Services (USCIS) may not grant U-1 nonimmigrant status to any petitioner until new visas become available. Under 8 U.S.C. 1184(p)(6) and 1103(a), the Department of Homeland Security (DHS) may conduct a bona fide determination, and if warranted as a matter of discretion, provide employment authorization and deferred action.

At this time, the evidence demonstrates your family member's Form I-918, Supplement A petition for U nonimmigrant status is bona fide, and that they warrant a favorable exercise of discretion to receive employment authorization and deferred action. Your family member's employment authorization document and grant of deferred action are valid for a period of four years. Deferred action is an act of administrative convenience to the government which gives some cases lower priority for removal. However, USCIS updates and reviews background and security checks at regular intervals during this period, and USCIS reserves the right to revoke your employment authorization and terminate the grant of deferred action at any time if it determines there are no longer warranted or were granted in error.

USCIS grants employment authorization based on the bona fide determination and favorable exercise of discretion described above under 8 U.S.C. 1184(p) (6), as well as under 8 CFR 274a.12(c)(14), which gives the agency the authority to provide employment authorization to noncitizens placed in deferred action. On 03/03/2021, your family member filed a Form I-765. This Form I-765 is based on your family member's pending Form I-918, Supplement A, which USCIS has determined is bona fide. Please be aware that your family member's currently filed Form I-765 will be adjudicated as if it were filed under 8 CFR, section 274a.12(c)(14). Your family member will receive separate correspondence regarding the adjudication of your family member's Form I-765.

Priority for the issuance of U nonimmigrant status will be determined by the date the Form I-918 was received by USCIS. Once a visa is available to your family member, USCIS will determine their eligibility for U nonimmigrant status, and whether they are admissible to the United States.

If you are represented by an attorney, all further correspondence should be accompanied by Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative.

This notice does not constitute valid U nonimmigrant status or employment authorization, and may not be used to demonstrate legal immigration or employment status.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

**USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online.**

Nebraska Service Center
U.S. CITIZENSHIP & IMMIGRATION SVC
P.O. Box 82521
Lincoln NE 68501-2521



**USCIS Contact Center: www.uscis.gov/contactcenter**

EXHIBIT F





This card belongs to the Social Security Administration and you must return it if we ask for it.

If you find a card that isn't yours, please return it to:

Social Security Administration
P.O. Box 33008, Baltimore, MD 21290-3008

For any other Social Security business information, contact your local Social Security office. If you write to the above address for any business with a time returning a found card you will not receive a response.

Social Security Administration
Form SSA-3000 (12-2022)





EXHIBIT G

# THE AMERICAN PROSPECT

**IDEAS, POLITICS & POWER**

MANAGE A PRINT SUBSCRIPTION     MANAGE A RECURRING DONATION     DNC 2024     THE COLD CIVIL WAR

HOW PRICING REALLY WORKS     MONEY, POLITICS AND POWER     ECONOMIC MODELS     ECONOMIC POLICY

WORKING IN AMERICA +     ENERGY AND THE ENVIRONMENT +     HOUSING AND TRANSPORTATION +

CIVIL RIGHTS IN AMERICA     LAW AND JUSTICE     HEALTH AND SOCIAL POLICY     AMERICA AND THE WORLD

PODCASTS     THE PROSPECT ARCHIVE

# DHS Claims Videotaping ICE Raids Is 'Violence'

The expanded definition has justified assaults on journalists who have documented detentions of immigrants.

BY MATTHEW CUNNINGHAM-COOK   SEPTEMBER 9, 2025

3.4k
Shares

          



WINTERS ROCK ENTERTAINMENT

DHS officers confront a man filming with his phone outside the federal detention center in downtown Los Angeles, August 8, 2025.

_This article is published in partnership with the <u>Center for Media and Democracy</u>._

President Trump's Department of Homeland Security (DHS) claims that making and posting videos of ICE agents as they <u>disappear</u> tens of thousands of immigrants from America's streets, workplaces, and courtrooms without due process is an act of "violence" to be dealt with accordingly.

DHS Assistant Secretary for Public Affairs Tricia McLaughlin told the Center for Media and Democracy (CMD) that "videotaping ICE law enforcement and posting photos and videos of them online is doxing our agents," and added: "We will prosecute those who illegally harass ICE agents to the fullest extent of the law."

In one incident, ICE <u>targeted</u> a Georgia-based journalist, Mario Guevara, for videotaping enforcement operations. Guevara has legal work authorization in the U.S., <u>according</u> to his attorneys, and has been held in ICE detention for more than two months.

### _<u>More from Matthew Cunningham-Cook</u>_

McLaughlin's statement comes on the heels of a little-noticed <u>press briefing</u> in July where DHS Secretary Kristi Noem stated that "violence" is "anything that threatens [DHS agents] and their safety. It is doxing them. It is videotaping them where they're at."

That expansive definition is likely driving the department's claims of escalating "violence" against ICE agents, which purportedly rose from an alleged 700 percent increase on July 11, to 830 percent four days later, and to 1,000 percent by August 7. When asked by CMD to provide concrete examples of violent assaults on personnel, the DHS spokesperson pointed to an incident of trash dumped on an ICE agent's lawn and a sign with a profanity directed at an agent by name.

Peter Eliasberg, an American Civil Liberties Union (ACLU) of Southern California attorney representing journalists and observers who were attacked and injured by DHS officers in Los Angeles, told CMD that this definition bears "no relationship to what violence actually is. I don't think there's any evidence that … there is truth [in] those numbers."

Meanwhile, DHS agents have repeatedly resorted to violence, assaulting and injuring journalists and legal observers doing their jobs. The lawsuit filed by the Los Angeles Press Club, the NewsGuild–Communications Workers of America, and individual plaintiffs alleges that DHS agents used targeted, unchecked, and officially sanctioned violence against them, including "smashing the hands of people recording events with their phones" and shooting reporters with "less lethal" munitions.



WINTERS ROCK ENTERTAINMENT

DHS officers outside the federal detention center in downtown Los Angeles

Statements like Noem's and McLaughlin's raise serious concerns about the Trump administration's lack of respect for First Amendment rights, experts argue.

DHS appears to "fundamentally misunderstand the First Amendment," said David Cole, a First Amendment scholar and law professor at Georgetown. "The First Amendment is designed above all to give citizens the right to criticize and report on government abuse. There's not only no law against recording law enforcement officers doing their job, but it is a First Amendment–protected right to do so in public in ways that don't interfere with them carrying out their tasks. It reflects a failure [on the part of] the administration to understand the central role that watchdogs play in our democracy, [and any] attempt to restrict [that] goes against the First Amendment."

While the Supreme Court has rarely ruled on the matter, Cole said, a number of lower courts have concluded that as long as you are not interfering with the ability of law enforcement officers to do their jobs, "the government

cannot stop you from recording, either in memory, or [on a] legal pad, or … video recorder."

There is limited capacity for DHS to police itself. In March, the department shut down its Office for Civil Rights and Civil Liberties, abruptly closing 500 investigations into public complaints of violations in the process. In August, a report issued by the office of Sen. Jon Ossoff (D-GA) disclosed more than 500 incidents of rights violations in immigration detention facilities in the first seven months of Trump's second term. In July, Rep. Dave Min (D-CA) led a group of congressional Democrats in asking the DHS inspector general to investigate various assaults by ICE agents on civilians and members of Congress.

In response to a request for comment from CMD, ACLU senior staff attorney Scarlet Kim dismissed assertions by DHS that video recording is an act of violence. "The right to photograph, film, and publish publicly visible law enforcement activity is a core First Amendment right," she maintained. "It creates an independent record of what officers are doing, and it is no accident that some of the most high-profile cases of misconduct have involved video recordings. The burning question is why ICE officers feel the need to hide who they are and what they do from the public—masking their faces, lacking visible ID, driving unmarked vehicles, and now attacking those who document their activities."

While no state legislature has passed laws equating the video recording of police officers with "violence," some states have made the practice more difficult by mandating buffer zones to keep observers a certain distance away from officers and first responders when they arrive on a scene.

DHS, the third-largest cabinet department after the Departments of Defense and Veterans Affairs, is a sprawling 260,000-employee operation that includes Immigration and Customs Enforcement (ICE), Customs and Border Patrol (CBP), the Coast Guard, the Federal Protective Service, the Secret Service, the Federal Emergency Management Agency (FEMA), and the Transportation Security Administration.

With the recent passage of the One Big Beautiful Bill, DHS is set to receive another $44 billion on top of the $115 billion it had requested as part of the routine budgeting process. Within that, the budget for ICE has now skyrocketed to triple what it was in fiscal year 2024, making it larger than the military budgets of all but 15 other countries around the world.

## MATTHEW CUNNINGHAM-COOK

Matthew Cunningham-Cook is a writer and researcher with expertise in health care, retirement policy, and capital markets. He has written for The Intercept, The Lever, The New York Times, The Nation, Al Jazeera, and In These Times.

EXHIBIT H

| 1. To (Name, Address, City, State, Zip Code) | DEPARTMENT OF HOMELAND SECURITY |
|---|---|
| Meta Platforms, Inc.<br>1 Meta Way<br>Menlo Park, CA 94025 | **IMMIGRATION ENFORCEMENT**<br>**SUBPOENA**<br>to Appear and/or Produce Records<br>8 U.S.C. § 1225(d), 8 C.F.R. § 287.4 |

| Subpoena Number<br>FY25-ELC-0105 |
|---|

| 2. In Reference To | |
|---|---|
| Officer Safety/Doxing: Simeon | TICTAC: SIMEON |
| (Title of Proceeding) | (File Number, if Applicable) |

By the service of this subpoena upon you, **YOU ARE HEREBY SUMMONED AND REQUIRED TO:**

(A) ☐ **APPEAR** before the U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), or U.S. Citizenship and Immigration Services (USCIS) Official named in Block 3 at the place, date, and time specified, to testify and give information relating to the matter indicated in Block 2.

(B) ☒ **PRODUCE** the records (books, papers, or other documents) indicated in Block 4, to the CBP, ICE, or USCIS Official named in Block 3 at the place, date, and time specified.

Your testimony and/or production of the indicated records is required in connection with an investigation or inquiry relating to the enforcement of U.S. immigration laws. Failure to comply with this subpoena may subject you to an order of contempt by a federal District Court, as provided by 8 U.S.C. § 1225(d)(4)(B).

| 3. (A) CBP, ICE or USCIS Official before whom you are required to appear | (B) Date 09/08/2025 |
|---|---|
| ███████████████<br>████████████████████<br>███████████████████<br>██████████████ | (C) Time 1:00   ☐ a.m. ☒ p.m. |

4. Records required to be produced for inspection

Pursuant to an official, criminal investigation regarding officer safety, please provide the subscriber names, e-mails and telephone numbers associated as of 08/01/2025 through 09/03/2025 to the following Instagram Account usernames: ████████████ / ████████████ / lbprotest / ████████████ / ████████████ /

The response should be submitted electronically to ████████████████  Questions regarding this request can be addressed to ████████████  Monday through Thursday between the hours of 0700 and 1500. Do not process this request if a fee is required as it will not be approved or paid.

| 5. Authorized Official |
|---|
| _(Signature)_ |
| Daniel Blake |
| (Printed Name) |
| Special Operations Supervisor |
| (Title) |
| 09/03/2025 |
| (Date) |

If you have any questions regarding this subpoena, contact the CBP, ICE, or USCIS Official identified in Block 3.

DHS Form I-138 (6/09)

EXHIBIT I

| 1. To (Name, Address, City, State, Zip Code) | DEPARTMENT OF HOMELAND SECURITY |
|---|---|
| Meta Platforms, Inc.<br>1 Meta Way<br>Menlo Park, CA 94025 | **IMMIGRATION ENFORCEMENT**<br>**SUBPOENA**<br>to Appear and/or Produce Records<br>8 U.S.C. § 1225(d), 8 C.F.R. § 287.4 |

| Subpoena Number<br>FY25-ELC-0105 |
|---|

| 2. In Reference To | |
|---|---|
| Officer Safety/Doxing ▓▓▓▓▓ | ▓▓▓▓▓▓▓ |
| (Title of Proceeding) | (File Number, if Applicable) |

By the service of this subpoena upon you, **YOU ARE HEREBY SUMMONED AND REQUIRED TO:**

(A) ☐ **APPEAR** before the U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), or U.S. Citizenship and Immigration Services (USCIS) Official named in Block 3 at the place, date, and time specified, to testify and give information relating to the matter indicated in Block 2.

(B) ☒ **PRODUCE** the records (books, papers, or other documents) indicated in Block 4, to the CBP, ICE, or USCIS Official named in Block 3 at the place, date, and time specified.

Your testimony and/or production of the indicated records is required in connection with an investigation or inquiry relating to the enforcement of U.S. immigration laws. Failure to comply with this subpoena may subject you to an order of contempt by a federal District Court, as provided by 8 U.S.C. § 1225(d)(4)(B).

| 3. (A) CBP, ICE or USCIS Official before whom you are required to appear | (B) Date 09/08/2025 |
|---|---|
| ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | (C) Time 1:00    ☐ a.m. ☒ p.m. |

4. Records required to be produced for inspection

Pursuant to an official, criminal investigation regarding officer safety, please provide the subscriber names, e-mails and telephone numbers associated as of 08/01/2025 through 09/03/2025 to the following Instagram Account usernames: longbeachrapidresponse /
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

The response should be submitted electronically to ▓▓▓▓▓▓▓▓▓▓▓▓  Questions regarding this request can be addressed to ▓▓▓▓▓▓▓▓▓▓  Monday through Thursday between the hours of 0700 and 1500. Do not process this request if a fee is required as it will not be approved or paid.

| | 5. Authoriz▓▓▓▓▓▓▓▓▓▓▓ |
|---|---|
| If you have any questions regarding this subpoena, contact the CBP, ICE, or USCIS Official identified in Block 3. | (Printed Name) |
| | Special Operations Supervisor |
| | (Title) |
| | 09/03/2025 |
| | (Date) |

DHS Form I-138 (6/09)